HAMMER, UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF NORTH CAROLINA, *v.* DAGENHART ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NORTH CAROLINA.

No. 704.  Argued April 15, 16, 1918.—Decided June 3, 1918.

The Act of September 1, 1916, c. 432, 39 Stat. 675, prohibits transportation in interstate commerce of goods made at a factory in which, within thirty days prior to their removal therefrom, children under the age of 14 years have been employed or permitted to work, or children between the ages of 14 and 16 years have been employed or permitted to work more than eight hours in any day, or more than six days in any week, or after the hour of 7 P. M. or before the hour of 6 A. M. *Held,* unconstitutional as exceeding the commerce power of Congress and invading the powers reserved to the States.

The power to regulate interstate commerce is the power to prescribe the rule by which the commerce is to be governed; in other words, to control the means by which it is carried on.

The court has never sustained a right to exclude save in cases where the character of the particular things excluded was such as to bring them peculiarly within the governmental authority of the State or Nation and render their exclusion, in effect, but a regulation of interstate transportation, necessary to prevent the accomplishment, through that means of the evils inherent in them.

The manufacture of goods is not commerce, nor do the facts that they are intended for, and are afterwards shipped in, interstate commerce make their production a part of that commerce subject to the control of Congress.

The power to regulate interstate commerce was not intended as a means of enabling Congress to equalize the economic conditions in the States for the prevention of unfair competition among them, by forbidding the interstate transportation of goods made under conditions which Congress deems productive of unfairness.

It was not intended as an authority to Congress to control the States in the exercise of their police power over local trade and manufacture, always existing and expressly reserved to them by the Tenth Amendment.

Affirmed.

THE case is stated in the opinion.

*The Solicitor General,* with whom *Mr. Assistant Attorney General Frierson* and *Mr. Robert Szold* were on the brief, for appellant.

[The Government supported its argument upon the history and physical and economic effects of child labor by voluminous references to reports and debates in Congress and other public documents, including those bearing direct relation to the act in question.]

Unquestionably the power conferred by the commerce clause embraced all which the States had previously enjoyed over the subject, and "the power of a sovereign State over commerce, therefore, amounts to nothing more than a power to limit and restrain it at pleasure." *Gibbons* v. *Ogden,* 9 Wheat, 1, 227. While doubt has existed as to how far back Congress may reach prior to the actual start of the interstate journey (*Coe* v. *Errol,* 116 U. S. 517; *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *Loewe* v. *Lawlor,* 208 U. S. 274), and how far forward after the journey has ceased (*Brown* v. *Maryland,* 12 Wheat. 419; *McDermott* v. *Wisconsin,* 228 U. S. 115), it has never been doubted that when the actual transportation begins the jurisdiction of Congress at once attaches.

The act is upon its face a regulation. To regulate is "to prescribe the rule by which commerce is to be governed" (*Gibbons* v. *Ogden,* 9 Wheat. 1, 196); "to foster, protect, control and restrain" (*Second Employers' Liability Cases,* 223 U. S. 1, 47). One form of such regulation is prohibition. *In re Rahrer,* 140 U. S. 545; *Lottery Case,* 188 U. S. 321; *Hipolite Egg Co.* v. *United States,* 220 U. S. 45; *United States* v. *Lexington Mill & Elevator Co.,* 232 U. S. 399; *Hoke* v. *United States,* 227 U. S. 308; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311; *Seven Cases of Eckman's Alterative* v. *United States,* 239 U. S. 510. Indeed, the denial of the facilities of interstate

transportation to specified articles in terms precisely like those now in question has become a familiar and a customary method of regulation.    [Citing numerous acts of Congress.]

The substantial connection between the regulation and the actual interstate movement (*Adair* v. *United States,* 208 U. S. 161) is not questioned in this case.    The statute carefully avoids the difficulties in the first *Employers' Liability Cases,* 207 U. S. 463, by not applying to that commerce which is wholly within one State.

It sharply distinguishes between the manufacture, which lies wholly within one State, and the interstate movement.    No prohibitions are extended to manufacturers of goods as such, although they may intend subsequently to ship in interstate commerce.    *United States* v. *E. C. Knight Co.,* 156 U. S. 1.    A manufacturer may, notwithstanding the act, employ such children as he pleases.    The law springs into activity only when actual transportation to another State begins.

It cannot be denied that a change in public opinion regarding child labor has occurred like that in relation to lottery tickets.    Neither the ticket nor the labor is inherently bad, but the facts of life have disclosed undeniable evils in the use of both.    With the growth of industrial activity in the latter part of the nineteenth century the far-reaching effects of the employment of children in factories became manifest.    The dangers to persons of tender years in working about machinery are apparent to everyone.    But the evil effects on the child's physical well-being were shown by medical science to be not confined to the so-called dangerous occupations.    Night work and excessive hours of labor indoors in factories at a critical stage in the development of the child's body stunt the physique and decrease the resistance to disease.    The child worker becomes dwarfed in body and mind, and the State

is deprived of that vigorous citizenship upon which the success of democracy must depend.

The legislation of the States on the subject was not uniform, and many States were without the provisions which came to be regarded as the standard necessary for the public protection. Interstate commerce is not a technical legal conception but a practical one, drawn from the course of business. *Swift* v. *United States,* 196 U. S. 375, 398. In the day of steam and electricity the play of the forces of competition makes the cause operating in one State immediately felt in another. The slightest difference in the cost of production, or what amounts to the same thing, a belief on the part of manufacturers in the existence of such difference, alters the development of an industry. As the conviction grew that the employment of child labor was morally repugnant and socially unwise, it came to be regarded also in the light of unfair competition in trade among the States. The State authorizing the use of such labor in products shipped into other States was thought unfairly to discriminate against the citizens of the latter. Citizens in the States in which child labor products were introduced through interstate commerce were made unwilling parties to practices deemed immoral. The health of children in competing States was injuriously affected by the interstate transportation of child-made goods. Thus, if one State desired to limit the employment of children, it was met with the objection that its manufacturers could not compete with manufacturers of a neighboring State which imposed no such limitation. The shipment of goods in interstate commerce by the latter, therefore, operates to deter the former from enacting laws it would otherwise enact for the protection of its own children.

The manufacturers' argument is based upon the belief that child labor is cheaper. There is much reason for thinking this belief mistaken; but the facts of their com-

mon belief in it, of their insistent arguments before state legislatures, and of the resultant effect in postponing or relaxing state legislation with reference to child labor, can not be denied.

· The effect on one community of the importation from another of the products of cheap labor has been recognized by Congress in dealing with foreign commerce. It has prohibited the importation from foreign countries of convict-made goods. This exclusion was not designed to prohibit convict labor in foreign countries, but to prevent the lowering of standards in this country. The theory of much of our tariff legislation and of the Alien Contract Labor Law is the same.

The effect of low child labor standards in one State upon health in competing States is due entirely to the interstate character of the commerce in question. Because this is so a State can not protect itself. A state law forbidding entrance into the State of goods made by children of an age lower than that at which the State itself permits young persons to work would perhaps be valid in the absence of congressional legislation. *Asbell* v. *Kansas,* 209 U. S. 251; *Reid* v. *Colorado,* 187 U. S. 137; but see *Leisy* v. *Hardin,* 135 U. S. 100; *Schollenberger* v. *Pennsylvania,* 171 U. S. 1. But such a law would not be adequate, for the effects of the competition would be felt when goods from the competing States met in other States or at the ports for foreign exportation (the present law as enacted, therefore, includes a prohibition against shipment in foreign as well as domestic commerce). The conviction became gradually settled that the situation called for the exercise by Congress of its power to prescribe a uniform rule for the conduct of interstate commerce. Congress had thoroughly investigated the subject.

The act does not contravene the Fifth Amendment. The due process clause in that Amendment limits Congress

precisely as the same clause in the Fourteenth Amendment limits the State. *Lottery Case,* 188 U. S. 321, 356, 357; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311, 320, 332; *Twining* v. *New Jersey,* 211 U. S. 78, 100, 101. If therefore a State, notwithstanding the Fourteenth Amendment, may bar the facilities of intrastate commerce to goods made by children in factories, Congress may do likewise, so far as the Fifth Amendment is concerned, for interstate commerce. Prohibition of all intrastate commerce in child labor by a State clearly does not contravene the due process clause of the Fourteenth Amendment. *Sturges & Burn Mfg. Co.* v. *Beauchamp,* 231 U. S. 320; *People* v. *Ewer,* 141 N. Y. 129; *State* v. *Shorey,* 48 Oregon, 396; *Starnes* v. *Albion Mfg. Co.,* 147 N. Car. 556; *In re Weber,* 149 California, 392; *In re Spencer,* 149 California, 396; *Inland Steel Co.* v. *Yedinak,* 172 Indiana, 423; *State* v. *Rose,* 125 Louisiana, 462. Note also the cases in this court upholding statutes limiting the hours of labor for men and women.

There is no right to use the channels of interstate commerce to affect injuriously the health of the people in competing States; nor to consummate the injury to the producing child; nor in unfair competition.

The act is a legitimate exercise of legislative power for the protection of the public health. It is now settled that regulations of interstate commerce may have the quality of police measures. *Seven Cases of Eckman's Alterative* v. *United States,* 239 U. S. 510, 515; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 215. See also *Hoke* v. *United States,* 227 U. S. 308, 323; *Wilson* v. *United States,* 232 U. S. 563, 567; *Caminetti* v. *United States,* 242 U. S. 470, 492.

The act is reasonably calculated to protect the health of children in States competing with the point of origin. The shipment of child-made goods outside of one State directly induces similar employment of children in com-

peting States. It is not enough to answer that each State theoretically may regulate conditions of manufacturing within its own borders. As Congress saw the situation, the States were not entirely free agents. For salutary statutes had been repealed, legislative action on their part had been defeated and postponed time and again, solely by reason of the argument (valid or not) that interstate competition could not be withstood.

The act also protects the health of children in the producing State. The Fifth Amendment imposes no obstacle to the denial by Congress of facilities of interstate transit for the prevention of injury to children in the shipping State. Congress can outlaw such goods to prevent pollution of the interstate stream.

That the articles excluded are themselves innocuous is immaterial. *United States* v. *American Tobacco Co.,* 221 U. S. 106, 132. Discussion of the inherent badness of things is largely futile. How do we judge of goodness or badness except by their effect? Those things which work ill effects when transported across state lines are for that reason evil. The transportation of products of child labor, therefore, can not be classed as innocuous in fact.

As a matter of law, the regulating power is not limited to goods harmful *per se.* *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366; *Weeks* v. *United States,* 245 U. S. 618; *Wilson* v. *United States,* 232 U. S. 563; *Athanasaw* v. *United States,* 227 U. S. 326; *Compagnie Francaise* v. *Louisiana Board of Health,* 186 U. S. 380; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Seven Cases of Eckman's Alterative* v. *United States,* 239 U. S. 510. Liquor, lottery tickets, and misbranded food were legitimate objects until the legislature made them outlaws.

Congress acted reasonably in putting child-made goods in the same class.

A seller's liberty is not unduly restrained by protecting a purchaser from becoming an unwilling party to an im-

moral sale. *Plumley* v. *Massachusetts*, 155 U. S. 461; *United States* v. *Coca Cola Co.*, 241 U. S. 265; 285.

There is no right to use the channels of interstate commerce for unfair competition. Large authority was exercised in removing unfair discrimination as a means of competition in the Act to Regulate Commerce, and the Clayton Anti-Trust and Federal Trade Commission Acts. Industry and business are the controlling considerations. Sales detrimental to a state industry may be prohibited by a State. *Sligh* v. *Kirkwood*, 237 U. S. 52. In interstate commerce discretion is intrusted to Congress to determine which of the various business elements of the Nation is entitled to protection. An example of a prohibition of interstate trade for industrial reasons is in the quarantine of cattle fit enough for food in themselves but likely to damage the cattle industry in the receiving State. *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613, 623.

Congress believed that it was exercising in this case its power to forbid competition deemed unfair. Senate Report No. 358, 64th Cong., 1st sess.; House Report No. 46, 64th Cong., 1st sess. It was not fanciful to class shipment of child-made goods as unfair competition. Fraud and deceit are recognized acts of unfairness. An advantage derived by drawing on the blood of children is also immoral, according to the consensus of modern thought. Nor is immorality alone the test of unfair competition. An act unreasonably interfering with another's right to pursue trade, such as local price cutting, or hiring away of workmen, constitutes unfairness. Congress may well have thought that child labor deserved a like reprobation.

The extension of the prohibition to all products of the factory in which the child labors is a reasonable provision for the due enforcement of the act.

Assuming that the act does not contravene the Fifth

Amendment, there is no other clause of the Constitution to which it is obnoxious. *The Lottery Case*, 188 U. S. 321, 357.

To urge the reserved powers of the States is to beg the question. The reserved powers of the States do not begin until the power of Congress leaves off. [Instancing numerous cases in which exercises of the commerce power have been upheld though necessarily affecting state policy and control as to local matters; and numerous acts of Congress having such effect.]

There is no encroachment upon the reserved powers of the States. As said by Mr. Justice McKenna in *Hoke* v. *United States*, 227 U. S. 308, 320, "The power of Congress under the commerce clause of the Constitution is the ultimate determining question. If the statute be a valid exercise of that power, how it may affect persons or States is not material to be considered."

The Constitution grants to Congress no more power over the public in the receiving than in the shipping State. Neither is mentioned. It is the public, wherever situated, that is entitled to protection.

The argument that the evil is complete prior to the interstate movement is fallacious, for Congress enacted the statute to protect citizens outside of the shipping State.

Congress was attempting to regulate commerce in good faith and not to do indirectly what it could not do directly. It sought only to prevent the evil resulting from the interstate transportation of child-made goods. The court is confined to the purpose as expressed in the act. *McCray* v. *United States*, 195 U. S. 27. Nor is it concerned with questions of the wisdom, expediency, or oppressive character of legislation. *Id.*

*Mr. Morgan J. O'Brien* and *Mr. W. M. Hendren*, with whom *Mr. Clement Manly*, *Mr. W. P. Bynum* and *Mr. Junius Parker* were on the brief, for appellees:

If the transaction or conduct is not within the grant of power to Congress, it lies within the controlling power of the State in the exercise of the police power. 10th Amendment; *Martin* v. *Hunter*, 1 Wheat. 304, 326; *House* v. *Mayes*, 219 U. S. 270, 281–282; *New York* v. *Miln*, 11 Pet. 102.

The only suggested source of authority to legislate on the subject of the act is the Commerce Clause, which Madison said (3 Farrand, Records of Federal Constitution) "was intended as a negative and preventive provision against injustice in the states themselves, rather than as a power to be used for the positive purposes of the general government."

Is the act a regulation of commerce in the constitutional sense? Or is it a regulation of some one of the many internal affairs of the States which Congress is not empowered to deal with? *United States* v. *De Witt*, 9 Wall. 41; *United States* v. *E. C. Knight Co.*, 156 U. S. 1; *Employers' Liability Cases*, 207 U. S. 463, 502. A regulation of "all of these delicate, multiform and vital interests—interests which in their nature are, and must be, local in all the details of their successful management." *Kidd* v. *Pearson*, 121 U. S. 1, 21. The right of intercourse between the States has its source in the municipal law. The Constitution found it "an existing right and gave to Congress the right to regulate it," which is the right to prescribe the rule by which commerce is to be governed. *Gibbons* v. *Ogden*, 9 Wheat. 1, 211. With respect to his lawful goods, the citizen exercises a right. With respect to his unlawful goods, he enjoys a privilege, which Congress may withhold largely as it pleases.

While the power to regulate commerce among the several States is in the same grant and in the same terms with the power over foreign commerce, yet there is a difference with respect to the extent of that power growing out of the difference in the relation of the United

States to the two kinds of commerce, and the difference in the right of the citizen of the United States and the foreigner to engage therein. As to foreign commerce, the United States possesses and exercises all the attributes of sovereignty. As to interstate commerce, it exercises only that portion of sovereignty delegated to it. Prentice & Eagan, Commerce Clause of the Federal Constitution, 37–42; Judson on Interstate Commerce, Par. 2; 2 Tucker on the Constitution, Pars. 255, 256. This is illustrated in the plenary power of Congress over territory belonging to the United States and outside the boundaries of a State of the Union. The foreigner enjoys a privilege. The citizen exercises a right, subject only to that measure of interference to which he has consented.

It appears from the act itself: (1) That the articles made by children are in no way different from articles made by others. (2) That the purpose and effect of the act is to prevent the employment of children, and not to safeguard or promote commerce or the interests of persons or communities in the States into which child-made goods might be sent. That such is the purpose and expected effect, was avowed in the debates upon the floor of Congress, and before the committees to which the bill was referred.

The act itself shows the harmless quality of the goods. Articles heretofore barred and dealt with by this court have been such as could fairly be said to be "outlaws of commerce"; consequently all persons have been forbidden to ship them; the article itself is barred from commerce.

Does the power to regulate commerce extend to and include the power to prohibit harmless and useful commodities because of pre-commerce conditions of labor?

However much the *Knight Case,* 156 U. S. 1, may be weakened by later decisions, its distinction between production and commerce is still effective to prevent

direct congressional regulation of production as distinguished from sale and transportation.

It is not necessary to resort to the Fifth Amendment. But, if so, the grant of power in the Commerce Clause can not, in the guise of regulation, by a mere pretense of exercising this power, extend to the destruction of property interests only remotely related to commerce.

In regulating commerce, Congress regulates traffic in things, vehicles of transport and things *in transitu*, but not the things themselves. Before and after the *transitus*, they are beyond this power of regulation. The production and use of things in the *terminus a quo* and the *terminus ad quem* are not subjects of the commercial power, but of the State from which and to which they are transported. 2 Tucker, Const. 526.

The conditions reached and controlled by this act are subject only to that attribute of sovereignty called the "police power." With relation to matters of National import, has Congress all the attributes of sovereignty, or merely those surrendered to it by the people and not reserved to the States? Save in the instances provided therein the Fourteenth Amendment does not entrench upon the state police power. *Barbier* v. *Connolly*, 113 U. S. 21, 31. Is the only protection and security for the sovereignty and freedom of conduct sought to be reserved by the Tenth Amendment the limitation imposed upon Congress by the Fifth Amendment with respect to arbitrary action? Are not the rights so many and so vital and essential to the prosperity of the citizen and consequently of the Nation, as to indicate that their protection is entitled to and has a more fundamental basis, that is, that they have not been given over to the chance of arbitrary action?

The *Keller Case*, 213 U. S. 114, holds an act of Congress void, punishing harboring within a State an alien prostitute, as a regulation of a matter within the police

power reserved to the State. The power of Congress to regulate commerce among the States is not then the equivalent of the reserved police power of the States.

Congress has no general police power; it may exercise a police power only over a subject-matter already under its jurisdiction, by virtue of some authority delegated to it by the Constitution. In other words, a police purpose may be the reason for exercising a power possessed, but it is not a source of power. *Jacobson* v. *Massachusetts*, 187 U. S. 11; *Sherlock* v. *Alling*, 93 U. S. 99; 12 Corpus Juris, 910.

To uphold the act upon the theory of police power it must be clear that interstate commerce is menaced and not something else outside that domain.

Whatever menace there is in child labor has a locality. It cannot reasonably and fairly be said that the product of the factory where children are employed is so tainted by its origin that during or after transportation it constitutes a menace to health or morals or to any other subject within the domain of Congress. The menace, if it exists, is confined to where the child is employed. In invoking the police power, Congress is operating outside the domain of interstate commerce. A process of manufacture cannot obstruct or injuriously affect commerce when the product of that process is indistinguishable from the products of other processes. The statement that the power of Congress over commerce is full and complete does not aid the matter because that statement by Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, is preceded by and predicated upon the proposition that the subject of regulation is within the power asserted.

That the possession of full and complete power does not warrant the exercise of that power to bring about a result or condition outside that power, is strikingly exemplified in cases decided by this court, of which *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1, may be

mentioned, where the power of a State to fix the terms and conditions upon which foreign corporations may do business in the State was considered. So a general power of prohibition must exist to sustain the act. There is no such power. It is not a case of the possession of power restrained by certain limitations, but a case of the entire absence of power.

The authority of Congress to regulate commerce comprehends the power, within the limitations imposed by the nature and object of the grant, and those expressly set forth in the Constitution, to define what shall be commerce among the States, and, with a view to the effective exercise of its power to distinguish between things deleterious and things beneficial or innocuous, and to deny absolutely or conditionally entrance into such commerce to those things and persons which are deleterious, and, short of prohibition, to prescribe the rule by which the entrance to and movement in commerce of lawful and innocuous things and persons is to be governed. The *Obscene Literature Case*, the *Bad Egg Case*, the *White Slave Case* and the *Webb-Kenyon Case*, yield the principle that Congress may prevent the facility of interstate commerce from being made an instrument of evil, but in each of these cases, the subject of regulation retains, while moving in commerce, and at its journey's end, the inherent capacity to further the evil. The regulation did not reach back to the place of the creation of the subject as in the case at bar.

So far the adjudicated cases have gone and no further. A product of a condition which exists only within the confines of a State, before it may be said to affect commerce in such a way as to justify Congress in regulating it, must be one which retards or injures commerce, or in some manner burdens that commerce itself or one which retains its capacity to further an evil while actually moving in commerce.

Upon the assumption—which as a matter of fact is not correct—that the act prohibits only the product of child labor, it is said:—

· ·The object of the act is not to regulate conditions of labor within the States individually, for these are primarily of concern only to the State, but to establish a certain plane of competition with respect to the utilization of such labor for the benefit of the country at large.

From this standpoint, the question raised by the act boils down simply to this: May Congress exercise its power to regulate commerce among the States for what it conceives the good of the country at large, even to the extent of prohibiting altogether harmless and useful articles of commerce produced under conditions of labor which from this point of view it deems detrimental?

Investigation of whether Congress has done by indirection that which it can not do directly, is not foreclosed by the statement that courts do not pass on the motives of Congress. They do not pass upon them to see whether they are good or bad, but when power is called into play, not for the purpose for which it was given, but for a covert purpose, it becomes not an abuse of a power, but the exercise of an unconferred power, and the duty is incumbent upon the court to determine this matter, and legislation may properly be characterized as covert, though its purpose and effect is to cure what is admitted to be an evil. *McCray* v. *United States*, 195 U. S. 27; *McCulloch* v. *Maryland*, 4 Wheat. 316 Covert legislation is legislation whose constitutional support bears no sincere relation to the legislative and popular purpose sought to be attained.

The act fixes a standard of child labor and debars from interstate and foreign commerce, for a period of thirty days from its production, *all* product of the mine, quarry, mill, factory or workshop in which the standard fixed by the act does not prevail, without regard to whether

child labor has entered in whole or in part into its production.

A congressional enactment can not be said to be a regulation of commerce among the several States within the meaning of the Constitution, unless it:

(1) Regulates some subject that is connected with interstate commerce directly or proximately and not merely remotely.

(2) Regulates commerce in some particular bearing a direct relation to interstate commerce.

(3) Can fairly be said, upon construing the whole scope of the law, that it is a regulation of interstate commerce and not a regulation of some other subject which Congress is not empowered to regulate. *Atlantic Coast Line R. R. Co.* v. *Riverside Mills,* 219 U. S. 186.

In the case at bar, there is no sincere and legitimate relation between the thing prohibited and the object to be attained. Congress is doing indirectly what it can not do directly. Certainly the grant was not intended to give Congress any greater power over interstate commerce than the States have over domestic commerce. The State can not close the door of commerce to lawful goods, though it may, by virtue of the police power, control the conditions out of which the commerce comes.

The act reaches beyond the body of commerce itself, and legislates in the *form* of a regulation of commerce to promote what is deemed to be the welfare of the people. It does more than prohibit the transportation of articles of commerce. In effect it is a prohibition of their creation, unless the local conditions of manufacture conform to the congressional standard.

The nature and ends of legislative power limit the extent of it, and the nature and extent of the grant must be determined in view of the object for which those powers are given. *Calder* v. *Bull,* 3 Wall. 388; *Legal Tender Cases,* 12 Wall. 531. The intention of the framers of the

Constitution in conferring the power to regulate commerce was (*Veazie* v. *Moore*, 14 How. 574):

"To establish perfect equality amongst the several states as to commercial rights," and (*Lehigh Valley R. R. Co.* v. *Pennsylvania*, 145 U. S. 200):

"The chief mischief intended to be obviated was the conflict between the commercial regulations of the several states, which was destructive of their harmony, and fatal to their commercial interest abroad."

The very essence of regulation is the existence of something to be regulated, and consequently the suggestion of a general power to prohibit is contrary to the reason of the thing. Of necessity, there must be some limit on the power to regulate, even when, under some circumstances, it may include prohibition. Otherwise, commerce may be destroyed. What fixes that limit? Public opinion as reflected by Congress, subject to the limited review permitted by the Fifth Amendment, or the logical and visible line of demarcation now drawn between "outlaws of commerce" and wholesome and lawful articles of commerce? That there is a difference with relation to the power of government between lawful and unlawful articles of commerce, appears from the opinions in the *Schollenberger Case*, 171 U. S. 1, and *McDermott* v. *Wisconsin*, 228 U. S. 115. The prohibitory power is limited to "the kind of traffic which no one" is "entitled to pursue as of right." The line of demarcation is found in the nature and quality of the goods, and the rights with respect thereto, rather than in the limited review permitted under the Fifth Amendment.

The ability to create, and free and unfettered action in transporting property, are essential to the citizen and to the welfare of the country. The right is so necessary and so paramount that it is difficult to say that the people would contemplate reposing in even an elective body like Congress an unlimited and unrestrained power over that

right, depending for its safety upon Congress refraining· from arbitrary action. The right needs and has a more certain and fundamental protection. While the majority opinion in the *Lottery Case* maintained that Congress was vested with a wide discretion in matters of interstate commerce, yet it based the power to prohibit upon the inherent quality of illegality in the lottery tickets themselves.

The fundamental and far reaching question here to be determined is: Is there a line between "the commercial power of the Union and the municipal power of the State?". Has Congress absorbed the police power of the States? If Congress has the power here asserted, it is difficult to conceive what is left to the States.

MR. JUSTICE DAY delivered the opinion of the court.

A bill was filed in the United States District Court for the Western District of North Carolina by a father in his own behalf and as next friend of his two minor sons, one under the age of fourteen years and the other between the ages of fourteen and sixteen years, employees in a cotton mill at Charlotte, North Carolina, to enjoin the enforcement of the act of Congress intended to prevent interstate commerce in the products of child labor. Act of Sept. 1, 1916, c. 432, 39 Stat. 675.

The District Court held the act unconstitutional and entered a decree enjoining its enforcement. This appeal brings the case here. The first section of the act is in the margin.[1]

---

[1] That no producer, manufacturer, or dealer shall ship or deliver for shipment in interstate or foreign commerce any article or commodity the product of any mine or quarry, situated in the United States, in which within thirty days prior to the time of the removal of such product therefrom children under the age of sixteen years have been employed or permitted to work, or any article or commodity the

· ·Other sections of the act contain provisions for its enforcement and prescribe penalties for its violation.

The attack upon the act rests upon three propositions: First: It is not a regulation of interstate and foreign commerce; Second: It contravenes the Tenth Amendment to the Constitution; Third: It conflicts with the Fifth Amendment to the Constitution.

The controlling question for decision is: Is it within the authority of Congress in regulating commerce among the States to prohibit the transportation in interstate commerce of manufactured goods, the product of a factory in which, within thirty days prior to their removal therefrom, children under the age of fourteen have been employed or permitted to work, or children between the ages of fourteen and sixteen years have been employed or permitted to work more than eight hours in any day, or more than six days in any week, or after the hour of seven o'clock P. M. or before the hour of 6 o'clock A. M.?

The power essential to the passage of this act, the Government contends, is found in the commerce clause of the Constitution which authorizes Congress to regulate commerce with foreign nations and among the States.

In *Gibbons* v. *Ogden*, 9 Wheat. 1, Chief Justice Marshall, speaking for this court, and defining the extent and nature of the commerce power, said, "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed." In other words, the power is one to control the means by which commerce is carried on, which is

---

product of any mill, cannery, workshop, factory, or manufacturing establishment, situated in the United States, in-which within thirty days prior to the removal of such product therefrom children under the age of fourteen years have been employed or permitted to work, or children between the ages of fourteen years and sixteen years have been employed or permitted to work more than eight hours in any day, or more than six days in any week, or after the hour of seven o'clock postmeridian, or before the hour of six o'clock antemeridian.

directly the contrary of the assumed right to forbid commerce from moving and thus destroy it as to particular commodities. But it is insisted that adjudged cases in this court establish the doctrine that the power to regulate given to Congress incidentally includes the authority to prohibit the movement of ordinary commodities and therefore that the subject is not open for discussion. The cases demonstrate the contrary. They rest upon the character of the particular subjects dealt with and the fact that the scope of governmental authority, state or national, possessed over them is such that the authority to prohibit is as to them but the exertion of the power to regulate.

The first of these cases is *Champion* v. *Ames*, 188 U. S. 321, the so-called *Lottery Case*, in which it was held that Congress might pass a law having the effect to keep the channels of commerce free from use in the transportation of tickets used in the promotion of lottery schemes. In *Hipolite Egg Co.* v. *United States*, 220 U. S. 45, this court sustained the power of Congress to pass the Pure Food and Drug Act which prohibited the introduction into the States by means of interstate commerce of impure foods and drugs. In *Hoke* v. *United States*, 227 U. S. 308, this court sustained the constitutionality of the so-called "White Slave Traffic Act" whereby the transportation of a woman in interstate commerce for the purpose of prostitution was forbidden. In that case we said, having reference to the authority of Congress, under the regulatory power, to protect the channels of interstate commerce:

"If the facility of interstate transportation can be taken away from the demoralization of lotteries, the debasement of obscene literature, the contagion of diseased cattle or persons, the impurity of food and drugs, the like facility can be taken away from the systematic enticement to and the enslavement in prostitution and debauchery of women, and, more insistently, of girls."

In *Caminetti* v. *United States*, 242 U. S. 470, we held that Congress might prohibit the transportation of women in interstate commerce for the purposes of debauchery and kindred purposes. In *Clark Distilling Co.* v. *Western Maryland Ry. Co.*, 242 U. S. 311, the power of Congress over the transportation of intoxicating liquors was sustained. In the course of the opinion it was said:

"The power conferred is to regulate, and the very terms of the grant would seem to repel the contention that only prohibition of movement in interstate commerce was embraced. And the cogency of this is manifest since if the doctrine were applied to those manifold and important subjects of interstate commerce as to which Congress from the beginning has regulated, not prohibited, the existence of government under the Constitution would be no longer possible."

And, concluding the discussion which sustained the authority of the Government to prohibit the transportation of liquor in interstate commerce, the court said:

". . . the exceptional nature of the subject here regulated is the basis upon which the exceptional power exerted must rest and affords no ground for any fear that such power may be constitutionally extended to things which it may not, consistently with the guarantees of the Constitution, embrace."

In each of these instances the use of interstate transportation was necessary to the accomplishment of harmful results. In other words, although the power over interstate transportation was to regulate, that could only be accomplished by prohibiting the use of the facilities of interstate commerce to effect the evil intended.

This element is wanting in the present case. The thing intended to be accomplished by this statute is the denial of the facilities of interstate commerce to those manufacturers in the States who employ children within the prohibited ages. The act in its effect does not regulate

transportation among the States, but aims to standardize the ages at which children may be employed in mining and manufacturing within the States. The goods shipped are of themselves harmless. The act permits them to be freely shipped after thirty days from the time of their removal from the factory. When offered for shipment, and before transportation begins, the labor of their production is over, and the mere fact that they were intended for interstate commerce transportation does not make their production subject to federal control under the commerce power.

Commerce "consists of intercourse and traffic  .  . and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities." The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce, make their production a part thereof. *Delaware, Lackawanna & Western R. R. Co.* v. *Yurkonis,* 238 U. S. 439.

Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.

When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state. (Mr. Justice Jackson in *In re Green,* 52 Fed. Rep. 113. This principle has been recognized often in this court. *Coe* v. *Errol,* 116 U. S. 517; *Bacon* v. *Illinois,* 227 U. S. 504, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the States, a result certainly not contemplated by the

framers of the Constitution when they vested in Congress the authority to regulate commerce among the States. *Kidd* v. *Pearson*, 128 U. S. 1, 21.

It is further contended that the authority of Congress may be exerted to control interstate commerce in the ship- ment of child-made goods because of the effect of the circulation of such goods in other States where the evil of this class of labor has been recognized by local legisla- tion, and the right to thus employ child labor has been more rigorously restrained than in the State of production. In other words, that the unfair competition, thus engen- dered, may be controlled by closing the channels of interstate commerce to manufacturers in those States where the local laws do not meet what Congress deems to be the more just standard of other States.

There is no power vested in Congress to require the States to exercise their police power so as to prevent pos- sible unfair competition. Many causes may coöperate to give one State, by reason of local laws or conditions, an economic advantage over others. The Commerce Clause was not intended to give to Congress a general authority to equalize such conditions. In some of the States laws have been passed fixing minimum wages for women, in others the local law regulates the hours of labor of women in various employments. Business done in such States may be at an economic disadvantage when compared with States which have no such regulations; surely, this fact does not give Congress the power to deny transportation in interstate commerce to those who carry on business where the hours of labor and the rate of compensation for women have not been fixed by a standard in use in other States and approved by Congress.

The grant of power to Congress over the subject of interstate commerce was to enable it to regulate such commerce, and not to give it authority to control the

States in their exercise of the police power over local trade and manufacture.

The grant of authority over a purely federal matter was not intended to destroy the local power always existing and carefully reserved to the States in the Tenth Amendment to the Constitution.

Police regulations relating to the internal trade and affairs of the States have been uniformly recognized as within such control. "This," said this court in *United States* v. *Dewitt*, 9 Wall. 41, 45, "has been so frequently declared by this court, results so obviously from the terms of the Constitution, and has been so fully explained and supported on former occasions, that we think it unnecessary to enter again upon the discussion." See *Keller* v. *United States*, 213 U. S. 138, 144, 145, 146. Cooley's Constitutional Limitations, 7th ed., p. 11.

In the judgment which established the broad power of Congress over interstate commerce, Chief Justice Marshall said (9 Wheat. 203): "They [inspection laws] act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation, which embraces everything within the territory of a state, not surrendered to the general government; all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike-roads, ferries, &c., are component parts of this mass."

And in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 629, the same great judge said:

"That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that

the instrument they have given us is not to be so construed may be admitted."

That there should be limitations upon the right to employ children in mines and factories in the interest of their own and the public welfare, all will admit. That such employment is generally deemed to require regulation is shown by the fact that the brief of counsel states that every State in the Union has a law upon the subject, limiting the right to thus employ children. In North Carolina, the State wherein is located the factory in which the employment was had in the present case, no child under twelve years of age is permitted to work.

It may be desirable that such laws be uniform, but our Federal Government is one of enumerated powers; "this principle," declared Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, "is universally admitted."

A statute must be judged by its natural and reasonable effect. *Collins* v. *New Hampshire,* 171 U. S. 30, 33, 34. The control by Congress over interstate commerce cannot authorize the exercise of authority not entrusted to it by the Constitution. *Pipe Line Cases,* 234 U. S. 548, 560. The maintenance of the authority of the States over matters purely local is as essential to the preservation of our institutions as is the conservation of the supremacy of the federal power in all matters entrusted to the Nation by the Federal Constitution.

In interpreting the Constitution it must never be forgotten that the Nation is made up of States to which are entrusted the powers of local government. And to them and to the people the powers not expressly delegated to the National Government are reserved. *Lane County* v. *Oregon,* 7 Wall. 71, 76. The power of the States to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government.

*New York* v. *Miln*, 11 Pet. 102, 139; *Slaughter House Cases*, 16 Wall. 36, 63; *Kidd* v. *Pearson, supra.* To sustain this statute would not be in our judgment a recognition of the lawful exertion of congressional authority over interstate commerce, but would sanction an invasion by the federal power of the control of a matter purely local in its character, and over which no authority has been delegated to Congress in conferring the power to regulate commerce among the States.

We have neither authority nor disposition to question the motives of Congress in enacting this legislation. The purposes intended must be attained consistently with constitutional limitations and not by an invasion of the powers of the States. This court has no more important function than that which devolves upon it the obligation to preserve inviolate the constitutional limitations upon the exercise of authority, federal and state, to the end that each may continue to discharge, harmoniously with the other, the duties entrusted to it by the Constitution.

In our view the necessary effect of this act is, by means of a prohibition against the movement in interstate commerce of ordinary commercial commodities, to regulate the hours of labor of children in factories and mines within the States, a purely state authority. Thus the act in a twofold sense is repugnant to the Constitution. It not only transcends the authority delegated to Congress over commerce but also exerts a power as to a purely local matter to which the federal authority does not extend. The far reaching result of upholding the act cannot be more plainly indicated than by pointing out that if Congress can thus regulate matters entrusted to local authority by prohibition of the movement of commodities in interstate commerce, all freedom of commerce will be at an end, and the power of the States over local matters may be eliminated, and thus our system of government be practically destroyed.

For these reasons we hold that this law exceeds the constitutional authority of Congress.   It follows that the decree of the District Court must be

*Affirmed.*

MR. JUSTICE HOLMES, dissenting.

The single question in this case is whether Congress has power to prohibit the shipment in interstate or foreign commerce of any product of a cotton mill situated in the United States, in which within thirty days before the removal of the product children under fourteen have been employed, or children between fourteen and sixteen have been employed more than eight hours in a day, or more than six days in any week, or between seven in the evening and six in the morning.   The objection urged against the power is that the States have exclusive control over their methods of production and that Congress cannot meddle with them, and taking the proposition in the sense of direct intermeddling I agree to it and suppose that no one denies it.   But if an act is within the powers specifically conferred upon Congress, it seems to me that it is not made any less constitutional because of the indirect effects that it may have, however obvious it may be that it will have those effects, and that we are not at liberty upon such grounds to hold it void.

The first step in my argument is to make plain what no one is likely to dispute—that the statute in question is within the power expressly given to Congress if considered only as to its immediate effects and that if invalid it is so only upon some collateral ground.   The statute confines itself to prohibiting the carriage of certain goods in interstate or foreign commerce.   Congress is given power to regulate such commerce in unqualified terms.   It would not be argued today that the power to regulate does not include the power to prohibit.   Regulation means the prohibition of something, and when interstate

commerce is the matter to be regulated I cannot doubt that the regulation may prohibit any part of such commerce that Congress sees fit to forbid. At all events it is established by the *Lottery Case* and others that have followed it that a law is not beyond the regulative power of Congress merely because it prohibits certain transportation out and out. *Champion* v. *Ames*, 188 U. S. 321, 355, 359, *et seq.* So I repeat that this statute in its immediate operation is clearly within the Congress's constitutional power.

The question then is narrowed to whether the exercise of its otherwise constitutional power by Congress can be pronounced unconstitutional because of its possible reaction upon the conduct of the States in a matter upon which I have admitted that they are free from direct control. I should have thought that that matter had been disposed of so fully as to leave no room for doubt. I should have thought that the most conspicuous decisions of this Court had made it clear that the power to regulate commerce and other constitutional powers could not be cut down or qualified by the fact that it might interfere with the carrying out of the domestic policy of any State.

The manufacture of oleomargarine is as much a matter of state regulation as the manufacture of cotton cloth. Congress levied a tax upon the compound when colored so as to resemble butter that was so great as obviously to prohibit the manufacture and sale. In a very elaborate discussion the present Chief Justice excluded any inquiry into the purpose of an act which apart from that purpose was within the power of Congress. *McCray* v. *United States*, 195 U. S. 27. As to foreign commerce see *Weber* v. *Freed*, 239 U. S. 325, 329; *Brolan* v. *United States*, 236 U. S. 216, 217; *Buttfield* v. *Stranahan*, 192 U. S. 470. Fifty years ago a tax on state banks, the obvious purpose and actual effect of which was to drive them, or at least

their circulation, out of existence, was sustained, although the result was one that Congress had no constitutional power to require. The Court made short work of the argument as to the purpose of the act. "The judicial cannot prescribe to the legislative department of the government limitations upon the exercise of its acknowledged powers." *Veazie Bank* v. *Fenno,* 8 Wall. 533. So it well might have been argued that the corporation tax was intended under the guise of a revenue measure to secure a control not otherwise belonging to Congress, but the tax was sustained, and the objection so far as noticed was disposed of by citing *McCray* v. *United States. Flint* v. *Stone Tracy Co.,* 220 U. S. 107. And to come to cases upon interstate commerce, notwithatanding *United States* v. *E. C. Knight Co.,* 156 U. S. 1, the Sherman Act has been made an instrument for the breaking up of combinations in restraint of trade and monopolies, using the power to regulate commerce as a foothold, but not proceeding because that commerce was the end actually in mind. The objection that the control of the States over production was interfered with was urged again and again but always in vain. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 68, 69. *United States* v. *American Tobacco Co.,* 221 U. S. 106, 184. *Hoke* v. *United States,* 227 U. S. 308, 321, 322. See finally and especially *Seven Cases of Eckman's Alterative* v. *United States,* 239 U. S. 510, 514, 515. The Pure Food and Drug Act which was sustained in *Hipolite Egg Co.* v. *United States,* 220 U. S. 45, with the intimation that "no trade can be carried on between the States to which it [the power of Congress to regulate commerce] does not extend," 57, applies not merely to articles that the changing opinions of the time condemn as intrinsically harmful but to others innocent in themselves, simply on the ground that the order for them was induced by a preliminary fraud. *Weeks* v. *United States,* 245 U. S. 618. It does not matter whether the supposed

evil precedes or follows the transportation.  It is enough
that in the opinion of Congress the transportation en-
courages the evil.   I may add that in the cases on the
so-called White Slave Act it was established that the
means adopted by Congress as convenient to the exercise
of its power might have the character of police regula-
tions.  *Hoke* v. *United States,* 227 U. S. 308, 323.  *Cam-
inetti* v. *United States,* 242 U. S. 470, 492.   In *Clark Dis-
tilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311,
328, *Leisy* v. *Hardin,* 135 U. S. 100, 108, is quoted with
seeming approval to the effect that "a subject matter
which has been confided exclusively to Congress by the
Constitution is not within the jurisdiction of the police
power of the State, unless placed there by congressional
action."   I see no reason for that proposition not apply-
ing here.

The notion that prohibition is any less prohibition when
applied to things now thought evil I do not understand.
But if there is any matter upon which civilized countries
have agreed—far more unanimously than they have with
regard to intoxicants and some other matters over which
this country is now emotionally aroused—it is the evil of
premature and excessive child labor.   I should have
thought that if we were to introduce our own moral
conceptions where in my opinion they do not belong, this
was preëminently a case for upholding the exercise of
all its powers by the United States.

But I had thought that the propriety of the exercise
of a power admitted to exist in some cases was for the con-
sideration of Congress alone and that this Court always
had disavowed the right to intrude its judgment upon
questions of policy or morals.  It is not for this Court
to pronounce when prohibition is necessary to regulation
if it ever may be necessary—to say that it is permissible
as against strong drink but not as against the product of
ruined lives.

The act does not meddle with anything belonging to the States. They may regulate their internal affairs and their domestic commerce as they like. But when they seek to send their products across the state line they are no longer within their rights. If there were no Constitution and no Congress their power to cross the line would depend upon their neighbors. Under the Constitution such commerce belongs not to the States but to Congress to regulate. It may carry out its views of public policy whatever indirect effect they may have upon the activities of the States. Instead of being encountered by a prohibitive tariff at her boundaries the State encounters the public policy of the United States which it is for Congress to express. The public policy of the United States is shaped with a view to the benefit of the nation as a whole. If, as has been the case within the memory of men still living, a State should take a different view of the propriety of sustaining a lottery from that which generally prevails, I cannot believe that the fact would require a different decision from that reached in *Champion* v. *Ames.* Yet in that case it would be said with quite as much force as in this that Congress was attempting to intermeddle with the State's domestic affairs. The national welfare as understood by Congress may require a different attitude within its sphere from that of some self-seeking State. It seems to me entirely constitutional for Congress to enforce its understanding by all the means at its command.

MR. JUSTICE MCKENNA, MR. JUSTICE BRANDEIS and MR. JUSTICE CLARKE concur in this opinion.