**HUME–SINCLAIR COAL MINING CO. v. NEE et al. and five other cases.**

Nos. 2785–2789, 2794.

District Court, W. D. Missouri, W. D.

Dec. 30, 1935.

Maurice H. Winger, Leland Hazard, George J. Winger, and Frank H. Terrell, all of Kansas City, Mo. (Winger, Reeder, Barker & Hazard and Langworthy, Spencer & Terrell, all of Kansas City, Mo., of counsel), for plaintiffs.

Maurice M. Milligan, U. S. Atty., and Randall Wilson, Thomas A. Costolow, and Sam C. Blair, Asst. U. S. Attys., all of Kansas City, Mo. (John Dickinson, Asst. Atty. Gen. of U. S., and John S. Yost and John Henry Lewin, Sp. Assts. to Atty. Gen.), for defendants.

REEVES, District Judge.

By these suits the constitutionality of the Bituminous Coal Conservation Act (15 U.S.C.A. § 801 et seq.) is challenged. Each of the plaintiffs is engaged in the business of mining, producing, and selling bituminous coal from its mines located within the Western Judicial District of Missouri, and has been so engaged over a period of years. Such product is sold at the mines and thence transported by the purchaser either in interstate commerce or to points within the state of Missouri.

The plaintiffs have experienced serious competition on account of the use of gas and oil for heating and power purposes. The mines of the plaintiffs are located in a territory served with equal or greater facility by producers of oil and gas. Because of the fluidity of the latter products, competition is sharp, prices must be lowered to meet competition, and necessarily the profits are small. According to the evidence, the net profits of the several plaintiffs as recently computed range from less than 4 per cent. to not more than 11 per cent. These figures do not take into account a proper return on the capital investment. It is averred by the plaintiffs that if required to pay the aggregate tax imposed by the act in question, or if required to comply with the regulatory provisions of said act, the plaintiffs would be compelled to discontinue their operations, close their mines, and liquidate their capitals and surpluses.

The act challenged was approved August 30, 1935. Its purposes, as stated in the title, are:

"To stabilize the bituminous coal-mining industry and promote its interstate commerce; to provide for cooperative marketing of bituminous coal; to levy a tax on bituminous coal and provide for a *drawback under certain conditions;* to declare the production, distribution, and use of bituminous coal to be affected with a national public interest; to conserve the bituminous coal resources of the United States; to provide for the general welfare, and for other purposes; and providing penalties."

The first section of the act (15 U.S.C.A. § 801) undertakes to justify the

legislation by asserting that the mining of bituminous coal is affected with a public interest; that such coal is employed in all of the industrial activities of the country, including transportation facilities, and that it is vitally related to "the health and comfort of the people of the United States"; that proper conservation of coal deposits demands a "controlled production and economical mining and marketing." Moreover, it is asserted in the act that: "The maintenance of just and rational relations between the public, owners, producers, and employees; the right of the public to constant and ample supplies of coal at reasonable prices; and the general welfare of the Nation require that the *bituminous coal industry be regulated as herein provided."*

As a further predicate or premise for the legislation, said section 1 asserts that the production and distribution of bituminous coal "bear upon and directly affect its interstate commerce and render *regulation of all such production and distribution imperative for the protection of such commerce and the national public service of bituminous coal and the normal governmental revenues derivable from such industry."* 15 U.S.C.A. § 802.

The foregoing are but a few of the reasons assigned by Congress for its regulatory authority over the production, sale, and distribution of bituminous coal. The act then provides for a commission within the Department of the Interior and the organization of such commission. The compensation of the members thereof is provided for. Authority is granted to said commission "to make and promulgate all reasonable rules and regulations for carrying out the provisions of this Act [chapter]." Section 2 (15 U.S.C.A. § 803).

Section 3 of the act (15 U.S.C.A. § 804) imposes "an excise tax of 15 per centum on the sale price at the mine, or in the case of captive coal the fair market value of such coal at the mine, such tax, subject to the later provisions of this section, to be payable to the United States by the producers of such coal, and to be payable monthly for each calendar month, on or before the first business day of the second succeeding month, and *under such regulations, and in such manner, as shall be prescribed by the Commissioner of Internal Revenue."*

The foregoing tax burden contained a proviso, "that any such coal producer who has filed with the National Bituminous Coal Commission his acceptance of the code provided for in Section 4 of this Act [sections 805, 806, 807 and 808 of this chapter], and who acts in compliance with the provisions of such code, shall be entitled to a drawback in the form of a credit upon the amount of such tax payable hereunder, equivalent to 90 per centum of the amount of such tax, to be allowed and deducted therefrom at the time settlement therefor is required, *in such manner as shall be prescribed by the Commissioner of Internal Revenue."* Upon acceptance of the Code, a producer is not "precluded or estopped from contesting the constitutionality" of its provisions.

Section 4 (15 U.S.C.A. § 805) contains detailed provisions for such regulations as suggested in the title. As a basis for such regulatory details, the following language is used: "For the purpose of carrying out the declared policy of this Act [chapter], the code shall contain the conditions, provisions, and obligations which will tend to *regulate interstate commerce in bituminous coal and transactions directly affecting interstate commerce in bituminous coal."*

It will be observed from the foregoing that the Congress seeks to regulate the production of coal as in interstate commerce. No regulatory provisions are provided by the act to facilitate the collection of the tax. Regulations for the collection of the tax "shall be prescribed by the Commissioner of Internal Revenue." Section 3 (15 U.S.C.A. § 804).

The several plaintiffs have filed motions for preliminary injunctions for the reason that under the law the accrual of taxes began on November 1, 1935, and payments thereon will be due on January 2d, next.

The several defendants have not only made a return to the application for a preliminary injunction, but have joined in an answer in each of the cases. In both the return to the application for an injunction and in the several answers of the defendants, the validity of the act is upheld and justified under the power of Congress to lay and collect taxes and regulate commerce between the states.

A further statement of facts will be made as they may appear to become per-

tinent in the course of this memorandum opinion.

1. At the outset the jurisdiction of the court is challenged by reason of the provisions of section 154, title 26 U.S.C. (26 U.S.C.A. § 1543), which forbids the maintenance of any suit "for the purpose of restraining the assessment or collection of any tax." If, therefore, the tax is one regularly provided under the taxing power of the Congress, this suit could not be maintained.

In the case of Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 456, 66 L.Ed. 822, the Supreme Court had before it the question of the constitutional validity of " 'An act taxing contracts for the sale of grain for future delivery, and options for such contracts, and providing for the regulation of boards of trade, and for other purposes.' "

In that case, as here, the question of the applicability of said section 154 arose. The court said: "In the case before us, a sale of grain for future delivery without paying the tax will subject one to heavy criminal penalties. To pay the heavy tax on each of many daily transactions which occur in the ordinary business of a member of the exchange, and then sue to recover it back would necessitate a multiplicity of suits, and, indeed, would be impracticable. * * * We think these exceptional and extraordinary circumstances with respect to the operation of this act make section 3224 [Section 154, Title 26 U.S.C. (26 U.S.C.A. § 1543)] inapplicable."

Moreover, an inspection of the act raises a serious question as to the exclusive congressional purpose to impose a tax.

The provision for a tax on such coal products is only one of several purposes stated in the act. Such other purposes are in no conceivable way related to the tax, but, on the contrary, are completely independent thereof. Moreover, the tax on the face of the act appears to serve as a penalty for failure to accept regulatory provisions of the act clearly outside the sphere of national authority.

2. The constitutional power for this legislation could only be exercised under the granted authority "to lay and collect Taxes * * * and Excises," or "to regulate Commerce * * * among the several States." Const. art. 1, § 8, cls. 1, 3.

The mining of coal is not subject to national authority, but is exclusively within the police power of the states. United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 A.L.R. 975, 27 A.L.R. 762; Heisler v. Thomas Colliery Co., 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237; Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 59 L.Ed. 1397; Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724.

There can be no reasonable question, however, of the right of Congress under its taxing authority to impose an excise tax upon coal as same may be produced and sold at the mines, or it may exact such tax upon the fair market value of the product at the mines. In such event, the Congress could prescribe only such regulations as might facilitate the collection of such tax. Under the act in question, such regulations are delegated to the Commissioner of Internal Revenue. Congress is specially authorized by the Constitution (article 1, § 8, cl. 18) "to make all Laws which shall be necessary and proper for carrying into Execution" the granted powers.

In the act now considered, it is not even intimated that the various regulatory provisions of the act were "necessary and proper" for executing the taxing power of Congress, nor are they in fact necessary and proper. As stated, these matters were left to the Commissioner of Internal Revenue.

In coal mining operations, while the national government may have the power to tax, the states, under the Tenth Amendment to the Constitution, have the exclusive power to regulate. If, therefore, the government, under the guise of a tax, could usurp the functions of the state by enforcing regulatory laws, the Tenth Amendment would be unavailing as a reservation of power to the states.

As pointed out in the case of McCulloch v. Maryland, 4 Wheat. 316, 423, 4 L.Ed. 579, the national government is one of limited powers. It has the right to exercise such incidental powers only as will enable it to execute its granted powers; nevertheless, "should congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government; it would become the painful duty of this

804

tribunal, should a case requiring such a decision come before it, to say, that such an act was not the law of the land."

The tax imposed in this case according to the evidence is so burdensome and onerous as to destroy the business of the plaintiffs. While it is undoubtedly within the congressional power to destroy by imposing a destructive tax, yet, in this instance, the act provides for a "drawback" of 90 per centum of the tax if *the producer will accept and subject himself to the regulatory provisions of a Code.* This Code is not designed to facilitate the collection of the tax, but the regulatory provisions of the Code are separate and apart and independent of the tax.

Clearly the tax stands as a penalty to compel submission to a national regulatory code. Under such circumstances, it falls within the principles announced in the Child Labor Tax Case, 259 U.S. 20, loc.cit. 38, 42 S.Ct. 449, 451, 66 L.Ed. 817, 21 A.L.R. 1432. The court there said: "Where the sovereign enacting the law has power to impose both tax and penalty, the difference between revenue production and mere regulation may be immaterial, *but not so when one sovereign can impose a tax only, and the power of regulation rests in another.*"

In this case the regulation of coal mining is not an incidental motive to the tax, but its purpose both as stated in the act and as stated in the answer and return of the defendants is to regulate. The only apparent purpose of the tax is to coerce the plaintiffs to submit to regulation. In the Child Labor Tax Case, supra, 259 U.S. 20, loc.cit. 39, 42 S.Ct. 449, 451, 66 L.Ed. 817, 21 A.L.R. 1432, the court said on this subject: "So here the so-called tax is a penalty to coerce people of a state to act as Congress wishes them to act in respect of a matter completely the business of the state government under the federal Constitution."

In the Child Labor Tax Case, a tax of 10 per cent. of the entire net profits received or accrued was imposed on persons operating factories or mines, where children under the age of fourteen years were employed or permitted to work. Such persons were relieved of liability for the tax where such children were employed unwittingly or where they were not employed at all. The act was held unconstitutional because it was "a heavy exaction for a departure from a detailed and specified course of conduct in business." The court said: "It is the high duty and function of this court in cases regularly brought to its bar to decline to recognize or enforce seeming laws of Congress, dealing with subjects not intrusted to Congress, but left or committed by the supreme law of the land to the control of the states."

The court there said, as may be properly said here: "The good sought in unconstitutional legislation is an insidious feature, because it leads citizens and legislators of good purpose to promote it, without thought of the serious breach it will make in the ark of our covenant, or the harm which will come from breaking down recognized standards. In the maintenance of local self-government, on the one hand, and the national power, on the other, our country has been able to endure and prosper for near a century and a half. * * * To give such magic to the word 'tax' would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states."

It is an interesting commentary and sidelight that Congress undertook to prohibit the employment of children in factories and mines by forbidding the transportation in interstate commerce of goods made at the factories and produced from mines where children were employed.

The constitutionality of the act was considered in the case of Hammer v. Dagenhart, a decision handed down June 3, 1918, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724. In that case it was specifically said that the making of goods and the mining of coal are not commerce, and that the regulation thereof is committed exclusively to the states. The court said, 247 U.S. 251, loc.cit. 272, 38 S.Ct. 529, 531, 62 L.Ed. 1011, 3 A.L.R. 649, Ann.Cas. 1918E, 724: "If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the States."

Moreover, the court said: "There is no power vested in Congress to require the states to exercise their police power

so as to prevent possible unfair competition."

In reference to the powers of the state, the court said: "The maintenance of the authority of the states over matters purely local is as essential to the preservation of our institutions as is the conservation of the supremacy of the federal power in all matters entrusted to the nation by the federal Constitution."

The court held the act unconstitutional as a clear invasion of state authority and a violation of the Tenth Amendment. Following such decision in the Hammer v. Dagenhart Case, Congress undertook to prohibit the employment of children in mines and factories by the enactment of a taxing law under the taxing power of the Constitution. This, too, was held unconstitutional in the Child Labor Tax Case, supra. The court held that the tax there imposed was in the nature of a penalty and was designed to coerce the mine or factory owner to submit to congressional regulation. The Congress was unable, therefore, to prohibit child labor in factories or mines either under its power to regulate commerce or under its taxing power.

In the very recent case of A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, the Supreme Court declared an act unconstitutional which undertook to provide a regulatory code for business purely intrastate because of its supposed effect on interstate commerce. The court repelled from its consideration extraordinary conditions which then existed, and even now exist. It said on that subject, 295 U.S. 495, loc.cit. 528, 55 S.Ct. 837, 842, 79 L.Ed. 1570, 97 A.L.R. 947: "Extraordinary conditions do not create or enlarge constitutional power. The Constitution established a national government with powers deemed to be adequate, as they have proved to be both in war and peace, but these powers of the national government are limited by the constitutional grants. Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary. Such assertions of extraconstitutional authority were anticipated and precluded by the explicit terms of the Tenth Amendment—'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States,

are reserved to the States respectively, or to the people.'"

Following an adverse ruling Congress, as in the child labor legislation, has apparently sought to exercise its authority to regulate matters purely local · under the taxing power of the Constitution.

3. Each and every one of the objects stated in the title of the act is outside the national and the congressional power, save only the power "to levy a tax on bituminous coal."

Standing alone, there is no authority under the Constitution to enable the Congress to stabilize the bituminous coal mining industry and promote its interstate commerce. It has no right to provide for cooperative marketing of bituminous coal at the mines; it cannot legislate because the production, distribution, and use of bituminous coal is affected with a national public interest, and it has no power specifically granted to make provision for the conservation of the bituminous coal resources.

Congress has no specially assigned power to make provision for the general welfare. The general welfare of the people can only be promoted, and can best be served, by a prudent and salutary exercise of the powers specifically granted in the Constitution. Encroachment upon the wisely reserved powers of the states does not promote the general welfare, but would tend inevitably to the destruction of local authority and would sound the death knell of Democratic government.

An examination of the act impresses that there was legislatorial doubt in its enactment. The tax was not related in any way to the regulatory provisions of the act. The heavy penalty for failure to submit to the Code and the rather negligible tax upon such submission argue strongly against it as a taxing law. The preliminary declaration in the act that the regulations were "imperative for the protection of * * * the normal governmental revenues derivable from such industry" (section 1 [15 U.S.C.A. § 802]) is suspicious to say the least. The tax constitutes a very small and wholly unrelated part of the act. The tax for failure to accept the Code is ruinous, and a comparatively small tax is laid if the Code is accepted. There is a suggestion in the act itself that producers accepting the Code would not be "precluded or estopped from contesting" its con-

stitutionality. Section 3 (15 U.S.C.A. § 804). These serve to create a feeling that there existed much doubt in the mind of the Congress. Moreover, the evidence disclosed that in the committee hearings, in correspondence with the committee, and reports emanating from the committee, and debates in Congress there appeared serious doubt as to the constitutionality of the act.

The question as to whether Congress could regulate the coal industry because of its influence on interstate commerce was completely settled in the case of A. L. A. Schechter Poultry Corporation v. United States, supra.

■ By legislative fiat the Congress could not convert property used exclusively in private business into a public utility. Michigan Public Utilities Comm. v. Duke, 266 U.S. 570, 45 S.Ct. 191, 69 L.Ed. 445, 36 A.L.R. 1105; Producers Transportation Co. v. Railroad Commission, 251 U.S. 228, 230, 40 S.Ct. 131, 64 L.Ed. 239; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280.

But even if affected with a public interest, nevertheless these are matters reserved exclusively to the states as the police power in such case would be involved and the national government is not authorized to enforce police regulations.

The case of Nebbia v. People of the State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, commonly known as the Milk Case, was one sustaining the police power of the state of New York, and in no manner intimated that the national government would possess such power. See Black on Constitutional Law (4th Ed.) § 128; 12 C.J. § 417, p. 910; Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394; United States v. DeWitt, 9 Wall. 41, 19 L.Ed. 593.

■ In view of the foregoing, there appears to be substantial doubt not only as to the validity of the act challenged, but, moreover, as to whether in fact it is a tax in contradistinction to a penalty. In view of Lipke v. Lederer, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061; Regal Drug Corp. v. Wardell, 260 U.S. 386, 43 S.Ct. 152, 67 L.Ed. 318; Hill v. Wallace, supra; Graham v. DuPont, 262 U.S. 234, 43 S.Ct. 567, 67 L.Ed. 965, the restric-

tive provisions of section 154, title 26 U.S.C. (26 U.S.C.A. § 1543) is inapplicable.

It further appears that the plaintiffs are threatened with irreparable injury. It is the present view upon the presentation thus far made that the alleged tax is but a penalty to coerce the plaintiffs to submit to an unauthorized and unconstitutional regulation. An injunction should therefore be granted as prayed.

Counsel for plaintiffs will prepare and submit an appropriate decree. With such decree, and concurrently with the filing of this memorandum opinion, findings of fact and conclusions of law submitted by counsel on both sides will be appropriately marked and filed as a compliance with a recently promulgated amendment to one of the Equity Rules (rule 70½, as amended in 1935, 28 U.S.C.A. following section 723).