UNITED STATES v. BASIC PRODUCTS CO.

(District Court, W. D. Pennsylvania.   September 9, 1919.)

No. 2214.

1. UNITED STATES ☞97—CANNOT APPROPRIATE PATENT WITHOUT COMPENSATION.

There is no reservation in the patent laws of right in the United States as against the inventor, and it cannot appropriate or use the invention without just compensation in any different way than it can appropriate or use any other article owned by a private citizen.

2. COMMERCE ☞48—FEDERAL TRADE COMMISSION CREATED UNDER POWER TO REGULATE INTERSTATE AND FOREIGN COMMERCE.

The Federal Trade Commission Act (Comp. St. §§ 8836a–8836k) was enacted by Congress in the exercise of its constitutional power to regulate interstate and foreign commerce.

3. COMMERCE ☞57—TRADE-MARKS AND TRADE-NAMES ☞80½, New, vol. 8A Key-No. Series—POWERS OF FEDERAL TRADE COMMISSION WHERE INTERSTATE COMMERCE OR UNFAIR TRADE ARE NOT INVOLVED.

The Federal Trade Commission *held* without power to demand access to the books and papers of a corporation which manufactured a patented article by secret process, not alleged to be engaged in interstate or foreign commerce, nor charged with unfair competition, for the purpose of obtaining information for the Navy Department as to the cost of manufacture, annual production, capital invested, etc.

4. MANDAMUS ☞10—RIGHT TO DEMAND AND DUTY TO PERFORM NECESSARY.

Mandamus issues where, and only where, there is a right to demand, and a corresponding duty to perform, the act required.

At Law.   Mandamus by the United States against the Basic Products Company.   On demurrer to answer.   Overruled.

R. L. Crawford, U. S. Dist. Atty., of Pittsburgh, Pa.
Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., for defendant.

ORR, District Judge.   To a petition filed by the Attorney General of the United States, at the request of the Federal Trade Commission, for a writ of mandamus upon the Basic Products Company, the

latter has made answer at considerable length. To that answer, the plaintiff has demurred. It is upon the demurrer that this case is now before the court.

While all the material averments of the answer, which are well pleaded, must be taken as true, yet the important questions in the case cannot be clearly outlined without reference to the petition as well, and without a statement of the particular grounds upon which the demurrer is based. The court therefore sets forth the substance of the pleadings, with quotations from the same, and with the use of italics where deemed proper for special emphasis.

With respect to the petition, it is to be noticed:

That there is no averment of any facts which show that the defendant is engaged in interstate commerce. The recital in the resolution of the Federal Trade Commission, which is hereinafter set forth, is not such averment.

The petition sets forth that on the 8th day of March, 1917, the Federal Trade Commission passed a resolution, and on the 11th of March following, caused notice thereof, and its demand in pursuance thereof, to be served on the defendant, which notice and demand are both set forth at length in the petition. They are embodied in one paper duly executed by the Federal Trade Commission. The part of said paper which contains the notice recites the date of the passage of the resolution as aforesaid, that it was passed at a regular session of said commission, and contains the resolution itself, which is as follows:

"Resolved, that pursuant to the provisions of subdivision (a) of section 6 of the act of Congress entitled 'An act to create a Federal Trade Commission, to define its powers and duties and for other purposes,' approved September 26, 1914, the commission proceed forthwith to gather and compile information concerning, and investigate the organization, business, conduct, practices, and management of the Basic Products Company, a corporation engaged in interstate commerce, and the relation of said Basic Products Company to other corporations, individuals, associations and partnerships; and be it further

"Resolved, that pursuant to the provisions of section 9 of said act of September 26, 1914, L. W. Plowman and H. L. Maxey are hereby designated as duly authorized agents of the Federal Trade Commission to examine and copy any and all documentary evidence of whatsoever character concerning the organization, business, conduct, practices, and management of said Basic Products Company, and its relation to other corporations, individuals, associations, and partnerships; and be it further

"Resolved, that a copy of this resolution be served on the said Basic Products Company, with a demand on behalf of the Federal Trade Commission that the said L. W. Plowman and H. L. Maxey, its agents, be permitted access to the books, papers, records, memoranda, and data of the said Basic Products Company for the purpose of carrying out the direction of this resolution."

The part of that paper containing the demand is as follows:

"Pursuant to the terms of said resolution, the Federal Trade Commission hereby formally demands of you an opportunity to examine any documentary evidence in your possession which relates to the organization, business, conduct, practices, and management of said Basic Products Company, a corporation, and its relation to other corporations and to individuals, associations, and partnerships, in order that copies may be made of any portions of said documentary evidence, as appears to be relevant to the subject matter of said investigation.

"The said Federal Trade Commission, by its duly authorized agents, viz. L. W. Plowman and H. L. Maxey, presents itself for the purpose of examination and making copies, if deemed advisable, of any documentary evidence within your possession or control and which relates to the above-entitled investigation now being conducted by it. *In particular, the Federal Trade Commission demands that it be permitted to examine and take copies, if deemed advisable, of all documentary evidence which relates to the production costs, annual production, and capital investment in the manufacturing of a commodity known as 'Syndolag.'*"

The petition further avers that, upon the service of said notice and demand, certain examiners, duly · authorized by the commission, presented themselves, within the usual business hours, at the office of the defendant in Pittsburgh—

"for the purpose of examination and making copies, if deemed advisable, of any documentary evidence within the possession and control of said defendant, *which related to the investigation then being conducted by said commission, as aforesaid,* and particularly of such documentary evidence *which related to the production costs, annual production, and capital investment in the manufacturing by defendant of a commodity known as 'Syndolag'; but said defendant wholly failed and refused and still fails and refuses to permit said representatives of the commission to examine said documentary evidence and make copies of same.*"

The petition concludes with a prayer for a writ of mandamus.

The answer to said petition avers:

(1) That the defendant is the manufacturer of a patented article known as "Syndolag," which has been developed by the defendant after great expenditure of time and money, and which, among its other uses, is widely sold by defendant for repairing the bottoms of open hearth steel furnaces, a purpose for which heretofore only imported Austrian magnesite could be used. Not only is the article patented, but in the production thereof the defendant has developed certain refinements of method which are and have been kept secret by defendant and which constitute trade secrets of great value, as are also the cost accounts relating to the production of such article.

(2) On or about September 4, 1918, the Navy Department of the United States ordered from defendant 250 tons of syndolag, for which defendant quoted a price of $35 per ton, which was then the usual and ordinary price, but the Navy Department refused to agree to such price, and required such material to be billed at the tentative price of $30 per ton. Pursuant to such order the defendant shipped to the said department 64.9 tons of said material. Subsequently thereto, after the armistice with Germany was signed, the balance of said order was canceled by the Navy Department and the defendant waived any claim against the United States by reason of such cancellation.

(3) During November and December, 1918, and January and February, 1919, repeated demands were made by the Navy Department for affidavits from defendant showing defendant's costs of production of said article for the pretended reason of enabling the Navy to decide upon the price which it would be willing to pay defendant for its product. Defendant then offered, and in the answer in this proceeding renews said offer, to accept any price for said material which the Navy Department may see fit to pay. While such demands were

being made by the said department, the latter nevertheless, on December 14, 1918, and January 19, 1919, paid defendant at the rate of $30 per ton for all syndolag delivered as aforesaid. The defendant, prior to the filing of the answer in the present proceeding, offered, and in the said answer renews such offer, to return to said department, or to the Treasurer of the United States as directed, any part of such price which is in excess of the price which the Navy Department, in its discretion, sees fit to pay for such product, or, should the Navy Department be unwilling or unable to fix such price, to refund to the Navy Department or to the Treasurer of the United States as directed, the whole amount received by defendant for such product.

(4) That the foregoing offers have been continuously made by defendant, yet under the pretense of fixing a price therefor, the aforesaid demands for affidavits have been made by the Navy Department without reason or just cause. When the defendant finally refused to furnish such affidavits, the Navy Department's said demands were then taken up by the Federal Trade Commission, at the request and for the purpose of the Navy Department, in an effort to secure for the Navy Department such information through an assertion of the powers of the Federal Trade Commission. Such Trade Commission did, on March 1, 1919, send examiners to defendant's plant with the following communication:

"Federal Trade Commission.

"Washington, March 1st, 1919.

"Basic Products Company, Kenova, W. Va.—Gentlemen: This will serve to introduce Messrs. L. W. Plowman and H. L. Maxey, examiners of the Federal Trade Commission.

"At the request of the Navy Department, the Federal Trade Commission has undertaken to ascertain the cost of producing the product known as 'Syndolag.' The commission also desires to ascertain the investment involved in the production of this product. It will, therefore, be necessary for its examiners to have full access to your books and records, including not only your cost sheets, but your profit and loss statement and balance sheet. The period to be covered is the year 1918.

"The commission requests your prompt co-operation with its examiners.

"Very truly yours,   Federal Trade Commission,
"[Signed]   Francis Walker, Chief Economist.
"L. H. H."

(5) No complaint has at any time been filed or entered against defendant by the government, or by any citizen, in regard to the organization, business, trade practices, or conduct of the defendant in any respect, nor has the defendant been guilty of unfair competition, nor has it been charged therewith.

(6) The defendant has refused, and, unless required by court, will continue to refuse to surrender its trade secrets as aforesaid to any such examiners, or to any other representatives of said Trade Commission, or said Navy Department.

(7) The defendant charges that the demand of said Trade Commission is unlawful, unconstitutional, and void for the following reasons:

(a) It is in direct violation of the provisions of the act creating said Trade Commission (Act Sept. 26, 1914, c. 311, 38 Stat. 721 [Comp.

St. 8836f]), section 6 whereof forbids the publication of trade secrets, whereas the demand upon defendant by said Trade Commission affirmatively shows that the purpose of said "investigation" is the ascertainment of trade secrets and the disclosure of information thereof to the Navy Department.

(b) That in the absence of charges or complaints against defendant, said Trade Commission is without power or authority to make the "investigation" demanded.

(c) That the access to defendant's properties and records, demanded by said Trade Commission and by the petition of the Attorney General, would constitute an unreasonable search and seizure from which defendant is entitled to protection by the Fourth Amendment of the Constitution of the United States.

(d) That the access to defendant's properties and records, demanded by said petition, would constitute a taking of the property of the defendant without due process of law in violation of the Fifth Amendment of the Constitution of the United States.

The reasons in support of the demurrer filed by the plaintiff are:

(1) A general demurrer that the answer is insufficient and irresponsive.

(2) That the defendant company has no standing to question the right of the plaintiff to a mandamus on the ground that no individual complaint or information has been made against it. That the right of the plaintiff is the right of original investigation conferred upon the Federal Trade Commission by Congress.

(3) That any reason which the defendant might have to withhold its books, etc., from inspection, should have been presented to the Trade Commission and not to the court.

(4) There is no attempt in this proceeding to take the properties or records of the defendant without due process of law, because the plaintiff in filing this proceeding is acting according to due process of law, and not in violation of any constitutional provision or any law thereunder.

In view of the Federal Trade Commission's letter of March 1, 1919, its resolution of the 8th day of the same month, and its notice and demand under date of the 11th of the same month, it plainly appears that said commission has undertaken to ascertain the cost of producing a product which is the subject of a patent, and to ascertain also the annual production thereof and the capital invested in the manufacture thereof. Why it has undertaken to do that is explained by the averments in the answer which must be taken as true. The purpose of such investigation is that the commission can give information as to the results of its investigation to the Navy Department. It would seem that it was intended by the commission to ascertain what is the just compensation which the Navy Department should pay for acquiring a right to such patented article, as is to be inferred from the following quotation from the brief of counsel on behalf of the plaintiff:

"It is inconceivable that the ascertainment of the cost of the production of a commodity produced by defendant under a process patent which gives it a

legal monopoly in the production of that product, could work any hardship upon the defendant; it has an exclusive property in the patented invention which cannot be appropriated or used by the government itself without just compensation (30 Cyc. 818), and certainly an orderly proceeding to ascertain what is just compensation in a given case could not violate the due process clause of the Constitution or any other provision."

[1] Under the constitutional power vested in Congress "to promote the progress of science and useful arts," letters patent of the United States secure to inventors the exclusive right to their discoveries. There is no reservation of right in the United States as against the inventor. The United States cannot appropriate or use the invention without just compensation, in any different way than it can appropriate or use any other article owned by a private citizen. James v. Campbell, 104 U. S. 356, 26 L. Ed. 786.

[2] The act of Congress under which the Federal Trade Commission has proposed to investigate the cost of producing a patented product and perhaps the amount of compensation which should be paid by the United States, in order that the Navy might acquire the same, does not in terms justify such proceeding. The act is aimed at unfair methods of competition in commerce. This is clearly seen by the first paragraph of section 5 (Comp. St. § 8836e), which consists of this language:

"That unfair methods of competition in commerce are hereby declared unlawful."

That provision is qualified by the meaning given in the act to the word "commerce." In section 4 it is provided that the word "commerce," when found in the act, means:

"Commerce among the several states or with foreign nations or in any territory of the United States, or in the District of Columbia, or between any such territory and another, or between any such territory and any state or foreign nation, or between the District of Columbia and any state or territory or foreign nation."

By applying that definition, then, to said first paragraph of section 5, we ascertain that it was the intent of Congress, by the passage of the act, to exercise some of the powers vested in it by the Constitution to regulate interstate and foreign commerce.

[3] The second paragraph of section 5 contains the expression of a general power conferred upon, and a general duty imposed upon, the said commission in these words:

"The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the acts to regulate commerce, from using unfair methods of competition in commerce."

Following that broad provision there are set forth many powers and duties. The remaining paragraphs of section 5 relate to complaints against persons, partnerships, or corporations; the methods of proceeding upon such complaints; the findings of fact by the commission, which "if supported by testimony shall be conclusive," and methods of enforcement of the orders of said commission through the aid of the courts.

As appears from the resolution of the commission hereinabove set forth, the provisions of section 5 are not relied upon as justification for the commission's action in the present case. The commission relies upon subdivision (a) of section 6 of the act. Section 6 contains a further statement of particular powers vested in the commission, and appears to authorize proceedings in which no complaints against any person, partnership, or corporation are required to be served. The opening of that section, including subdivision (a), is as follows:

"That the commission shall also have power—

"(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships."

The substance only of the remaining subdivisions of section 6 need be stated:

(b) The commission may require detailed reports from such corporations under oath.

(c) May investigate whether a final decree, intended to restrain any violation of the anti-trust acts, is being carried out, and upon the application of the Attorney General are required to do so.

(d) Upon direction of the President, or either house of Congress, the commission shall investigate alleged violations of the anti-trust acts by any corporation.

(e) Upon the application of the Attorney General, the commission shall investigate and make recommendations for the readjustment of the business of any corporation alleged to be violating the anti-trust acts.

(f) The commission may make public information obtained, "except trades secrets and names of customers," and may submit recommendations to Congress for additional legislation.

(g) May from time to time classify corporations and make rules and regulations for the purpose of carrying out the provisions of the act.

(h) The commission may investigate trade conditions in and with foreign countries.

The remaining sections of the act have little to do with the matter now before the court, yet their provisions may tend to assist the court in reaching the proper conclusion.

Section 7 (section 8836g) authorizes the court, in any suit in equity brought by the Attorney General, as provided in the anti-trust acts, after the conclusion of the testimony therein, if the court be of opinion that the plaintiff is entitled to relief, to refer said suit to the commission as a master in chancery, to formulate a decree. Section 8 (section 8836h) provides that, when directed by the President, the several departments and bureaus of the government shall furnish, upon its request, papers and information, in their possession relating to any corporation subject to the provisions of the act. Section 9 (section 8836i) gives the commission power to secure testimony, issue subpœnas, and compel the attendance of witnesses, and the production of documentary evidence from any place in the United States, at any designated place of hearing (which by section 3 [section 8836c] may be "in any part of the United States"). Such section also authorizes the District Court to enforce obedience to subpœnas issued by the commission, and gives the District Courts of the United States

jurisdiction to issue writs of mandamus upon the application of the Attorney General, commanding any person or corporation to comply with the provisions of this act. Section 10 (section 8836j) provides the penalties for failure to comply with the provisions of the act or with the orders of the commission. The punishment of any person disobeying a subpœna is by fine of not less than $1,000, nor more than $5,000, or by imprisonment for not more than one year, or by both. The punishment of any person who shall willfully make, or cause to be made, any false entry or statement of fact in any report required, or in any account, record, or memorandum kept by any corporation subject to this act, or who shall willfully neglect or fail to make, or cause to be made, full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appurtenant to the business of such corporation, or who shall willfully remove out of the jurisdiction of the United States, or willfully mutilate, alter, or by any other means falsify any documentary evidence of such corporation, or who shall willfully refuse to submit to the commission or to any of its authorized agents, for the purpose of inspection and taking copies, any documentary evidence of such corporation within its possession or within its control, shall be subject, upon conviction, to a fine of not less than $1,000, nor more than $5,000, or to imprisonment for the term of not more than three years, or to both such fine and imprisonment. If any corporation required by the act to file any report shall fail to do so within the time fixed by the commission, and such failure shall continue for 30 days after notice of such default, such corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure. There follows, then, a provision in said section for the punishment of any officer or employé of the commission who shall make public any information obtained by the commission without its authority, unless directed by the court.

From the foregoing review of the act it is plain that Congress intended to give the commission a power unprecedented in its scope. In the argument on behalf of the plaintiff, it was insisted that under the act, the commission was given the right to investigate any question having to do with any business of any corporation, except banks and common carriers subject to the control of the Interstate Commerce Commission, to conduct a hearing at any point in the United States, and compel there the attendance of any witnesses and the production of any records from any other point in the United States. There was no suggestion of the limitations to be found in the acts themselves, other than the limitation just mentioned. In other words, it was probably assumed that every corporation, with respect to which the commission intended to conduct an investigation, was engaged in interstate commerce within the meaning of the act. In the argument, as well as in the petition, there was lacking the assertion of facts which would bring the defendant within the terms of the act of Congress. Nowhere has it been made to appear that the defendant is engaged in interstate commerce in any other way than any other corporation or

any citizen may be so engaged, by making one or more shipments of manufactured goods from one state into another.

The following quotation from the opinion of Judge Jackson, in Re Greene (C. C.) 52 Fed. 104–113, contains not only a definition, but an elaboration thereof, which suggests not only the limitations upon the power of Congress, but also possibilities of the existence of activities by entities corporate or otherwise, which might be brought within the jurisdiction conferred by the act upon the Federal Trade Commission:

"Commerce among the states, within the exclusive regulating power of Congress, 'consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, as well as the purchase, sale, and exchange of commodities.' County of Mobile v. Kimball, 102 U. S. 691–702 [26 L. Ed. 238]; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 203, 5 Sup. Ct. 826 [29 L. Ed. 158]. In the application of this comprehensive definition, it is settled by the decisions of the Supreme Court: That such commerce includes, not only the actual transportation of commodities and persons between the states, but also the instrumentalities and processes of such transportation. That it includes all the negotiations and contracts which have for their object, or involve as an element thereof, such transmission or passage from one state to another. That such commerce begins, and the regulating power of Congress attaches, when the commodity or thing traded in commences its transportation from the state of its production or situs to some other state or foreign country, and terminates when the transportation is completed, and the property has become a part of the general mass of the property in the state of its destination. When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' At that time the power and regulating authority of the states ceases, and that of Congress attaches and continues, until it has reached another state, and becomes mingled with the general mass of property in the latter state. That neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other states, nor the preparation for their transportation from the state where produced or manufactured, prior to the commencement of the actual transfer, or transmission thereof to another state, constitutes that interstate commerce which comes within the regulating power of Congress, and, further, that after the termination of the transportation of commodities or articles of traffic from one state to another, and the mingling or merging thereof in the general mass of property in the state of destination, the sale, distribution, and consumption thereof in the latter state forms no part of interstate commerce. Pensacola Tel. Co. v. Western Union Tel. Co., 96 U. S. 1 [24 L. Ed. 708]; Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091 [29 L. Ed. 257]; Coe v. Errol, 116 U. S. 517–520, 6 Sup. Ct. 475 [29 L. Ed. 715]; Robbins v. Taxing Dist., 120 U. S. 497, 7 Sup. Ct. 592 [30 L. Ed. 694]; and Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6 [32 L. Ed. 346]. In the latter case the Supreme Court pointed out the distinction between commerce and the subjects thereof, and held that the manufacture of distilled spirits, even though they were intended for export to other states, was not commerce, falling within the regulating powers of Congress."

Imagination, if not experience, can suggest that persons, partnerships, and corporations may be engaged in interstate commerce by the transportation of merchandise solely by water; that their activities may give them their income from lighterage; or they may be engaged in the sole business of forwarding goods, with no interest in the ves-

sels or wagons on which they are transported. The foregoing are merely illustrations of activities which may perhaps be within the scope of the powers granted to the commission by the act as found in the fifth section thereof.

Imagination, however, cannot suggest such an extension of constitutional limitation as may justify the investigation undertaken by the commission in this case. Indeed, so far as the matter has been brought to the attention of the court, no such assertion of power has ever been made to the courts. Investigation under subdivision (a), section 6, is limited to corporations engaged in interstate commerce. The defendant is engaged in manufacture.

A comprehensive consideration of the lack of constitutional authority over industry is found in the language of Mr. Justice Lamar, who delivered the opinion of the court in Kidd v. Pearson, 128 U. S. 1, 20, 21, 9 Sup. Ct. 6, 10 (32 L. Ed. 346), as follows:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. * * * If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the states, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform, and vital interests—interests which in their nature are and must be local in all the details of their successful management. It is not necessary to enlarge on, but only to suggest, the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details."

In Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, Ann. Cas. 1918E, 724, the Supreme Court held an act of Congress to be unconstitutional, as exceeding the commerce power of Congress and invading the powers reserved to the states, which act was intended to prohibit transportation in interstate commerce of goods made at a factory in which children of tender years might be employed. In that case the court again emphasizes in the strongest language that Congress has a regulatory power over interstate transportation and its incidents, but that the production of articles intended for interstate commerce is a matter of local regulation; and it appears from the opinion of the court (247 U. S. 273, 38 Sup. Ct. 532, 62 L. Ed. 1101, Ann. Cas. 1918E, 724) that argument was made that Congress had authority to control the interstate shipments of child-

made goods in order to prevent unfair competition which would operate unjustly upon those who were forbidden by some states to employ child labor, and the court uses this language:

"There is no power vested in Congress to require the states to exercise their police power so as to prevent possible unfair competition. Many causes may co-operate to give one state, by reason of local laws or conditions, an economic advantage over others. The commerce clause was not intended to give to Congress a general authority to equalize such conditions."

Counsel for the defendant urges upon this court the necessity of declaring section 6 of the Trade Commission Act to be unconstitutional, not only "in so far as it authorizes investigations and compulsory disclosures of matters which are beyond the commerce power of Congress," but also "in so far as it attempts to authorize a search or seizure by an administrative agency of the Government without charge or suspicion of wrongdoing." While the contention of counsel is probably sound, this court does not deem it necessary to go farther than to hold that the commission have not the power to carry on investigation which they have assumed in the present case.

An incident of such investigation is the ascertainment of trade secrets. It is plain that the cost of manufacturing a patented product to which the manufacturer has the exclusive right may be a trade secret, a species of property of great value. This is also true of refinements of method in producing the same. The act prohibits the disclosure of trade secrets. The assumption that no such disclosure will be made disappears before the expressed intention to give the information to the Navy Department. We have, then, a contemplated search and seizure, and a contemplated taking of private property for public use, without due process of law, which are violative of the Fourth and Fifth Amendments of the Constitution.

[4] With respect to the third reason in support of the demurrer, little need be said. The act itself authorizes a petition for mandamus in aid of the commission.

"Mandamus issues where, and only where, there is a right to demand, and a corresponding duty to perform, the act required." 19 Standard Encyclopædia of Procedure, 128.

It never was intended that the extent of a free man's duty to perform should be determined by those who demand performance.

The demurrer must be overruled, and the petition for a writ of mandamus must be refused.