### LENROOT v. WESTERN UNION TELEGRAPH CO.
### No. 247.

Circuit Court of Appeals, Second Circuit.
March 3, 1944.

Francis R. Stark, of New York City, for appellant.

Archibald Cox, of Washington, D. C., for appellee.

Before LEARNED HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from an injunction, forbidding it to violate § 212 (a) of Title 29 U.S.C.A., by using messengers under sixteen, or motorcar drivers between sixteen and eighteen in transmitting telegrams. Both parties agree that the employment in question is within the meaning of "oppressive child labor" in § 203(l) of Title 29 U.S.C.A., and as defined by § 422.2 of Chapter 4, Title 29 of the Code of Federal Regulations; but the defendant maintains that the act does not apply to its business. The case was tried upon stipulated facts, most of which it is not necessary to state, as the general nature of the defendant's business is so well understood. All that we need say is that over eleven per cent of the telegraph messengers employed by the defendant are under sixteen years of age, and that a small percentage of its motorcar drivers are between sixteen and eighteen. Both sides moved for summary judgment, since the outcome depended altogether upon the meaning of the statute; and the judge, believing defendant to be within it, granted judgment for the plaintiff. We do not understand that the defendant disputes that it is engaged in interstate commerce; at any rate there can be no doubt that it is. Western Union Telegraph Co. v. Texas, 105 U.S. 460, 26 L.Ed. 1067; Western Union Telegraph Co. v. Pendleton, 122 U.S. 347, 7 S.Ct. 1126, 30 L.Ed. 1187; Western Union Telegraph Co. v. James, 162 U.S. 650, 16 S.Ct. 934, 40 L.Ed. 1105. Thus, Congress could unquestionably have forbidden the employment of the messengers and drivers here

in question, if it had wished. That does not, however, answer the question whether § 212(a) covers the business; and it does not do so, unless the defendant is a "producer" of "goods" which it "ships" in interstate commerce. While it is of course true that, taken in their colloquial sense, these words do not apply to its activities, they should not be so taken, for the statute has made its own definitions in § 203. Subdivision (i) of that section reads as follows: " 'Goods' means goods * * * wares, products, commodities, merchandise, or articles or subjects of commerce of any character." (Originally the words, "or subjects," were absent; they were added in the Senate Committee on Education and Labor.) Subdivision (j) reads: " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on."

■ In order to learn whether the defendant's business falls within the section so defined, we must consider exactly what steps sending a telegram comprises. Ordinarily, it is true, the sender thinks of the telegram as the actual transmission of his words to the addressee; and so he speaks of "sending" it and of its being "delivered," as though the same thing had left him, passed to the addressee's home or office and was there handed to him. Indeed, the defendant itself uses that very argument in order to bring itself within the exception in § 215(a) (1) which exempts common carriers from the act as to any goods not produced by them. It does no more, it says, than transport to the addressee intangible objects—the sender's words transformed into electric impulses; it "produces" no "goods," even though we read those words with their definitions. We might indeed agree, if the defendant did no more than carry written messages between the parties; conceivably the same might even be true, if it only provided means—like a telephone—by which the parties could communicate, though these consisted of pulsations of an electric current. But neither of these is what the defendant does. The sender either writes out his message on paper and delivers it to one of the defendant's messengers, or delivers it himself at one of the defendant's offices; or he dictates or telephones it to an employee at an office, who takes it down on paper in shorthand, or types it. The message so received never leaves that office; the addressee never sees it. Another

employee—or perhaps the same one—either uses it as a text for pressing a key in suitable dots and dashes, having a conventional significance to him and to another employee at the opposite end of a wire; or as a text for manipulating some other suitable device—like a "teletype"—by which equivalent movements will appear upon a similar device at the end of a wire. In either case nothing can be said to be "sent" between the office except pulsations of electrical current, which are not only not the sender's message, but would be totally incomprehensible to him or to the addressee, if either could perceive them. When these have been transmitted, they are either translated, if they are in code, or transcribed, if they are not; and the message so resulting is delivered either by messenger or by telephone to the addressee. From the foregoing it is at once apparent that there is not the least similarity between what the defendant does and the transportation of goods by a common carrier. It is also apparent that the defendant's activities are within the definition of "produced" in subdivision (j) of § 203; for, not only does it "handle" the sender's message, but it "works on" it, first, by changing it into something wholly different, and then by changing it back to a form like the original.

■ The only remaining question is whether the defendant "ships" any "goods." First, are there any "goods" concerned? To prove that there are the plaintiff relies upon the phrase, "subjects of commerce of any character" in subdivision (i); to which the defendant answers that we must judge that phrase by its context, which necessarily limits its meaning to "tangible" objects. It is here that the Senate amendment becomes important. Until that was made the subdivision had read: "wares, products, commodities, merchandise or articles of commerce of any character." So far as we can see, no more complete enumeration could have been made of every kind of "tangible"; so that, when the Senate expanded the phrase to include, not only "articles" of commerce, but "subjects" of commerce, the opposition would have meant nothing, if it had not included "intangibles." Moreover, not only had all kinds of "tangibles" been already included, but "subjects of commerce" was not a good description of "tangibles." Its introduction into a phrase which had been sufficient to include all kinds of "tangibles," cannot

be set down to tautology, or slovenly draughting; it demands that some additional significance be added. We need not with the plaintiff resort to opinions such as those of Johnson, J., in Gibbons v. Ogden, 9 Wheat. 1, 229, 230, 6 L.Ed. 23, in which the transmission of "intelligence" is spoken of as a "subject" of commerce. It is enough that we have unmistakable evidence of a purpose to extend the definition of subdivision (i) to everything which had been considered a "subject [s] of commerce": that is, to whatever Congress could regulate as such a subject. Last, we have to say whether, assuming that a message received for transmission is "goods," and that the defendant "produces" it, it also "ships" the message, when it sends the pulsations over the telegraph wires. Although that is indeed an inappropriate word to apply to "intangibles," its unfitness for the most part disappears, once we treat messages as "goods." Certainly we should stultify ourselves, having gone so far, if we were to refuse to understand it as covering what is here involved.

So much for textual analysis. The defendant also argues that, aside from any verbal correspondence which can be spelled out between the section and its business, § 212(a) as a whole and particularly the contrast between it and §§ 206 and 207, show that Congress did not mean to forbid the use of child labor when an employer was merely engaged in interstate commerce, but only in case he was engaged in shipping goods in commerce; in other words, that § 212(a) covers only those who are not engaged in interstate commerce. No reason is suggested for such a capricious limitation upon a purpose which was apparently pervasive; and the curious result would be that Congress singled out the more vulnerable of its powers for exercise, for in 1938, Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, had not yet been overruled. If it is right we must suppose that 'Congress meant to control the passage across state lines of goods made in a state under conditions which it disapproved—a power which at that time was still in doubt—but did not mean to regulate the conduct of interstate commerce in goods—a power which it had always incontestibly had. Moreover, there is no basis for the argument in the statute itself, for the contrast between the language of § 212(a) and of §§ 206 and 207

does not justify the inference made from it. The act was a compromise of two quite separate designs: that of the House, which was to regulate child labor by national standards; that of the Senate, which was to prevent one state from breaking down the standards of another by unregulated competition. The House won, and it would leave its plan in large part unrealized to omit child labor in interstate commerce—to say nothing of the fact that such commerce, and the shipment in commerce of goods made by child labor, are not inevitably mutually exclusive. Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 571, 572, note 5, affirmed 316 U. S. 517, 62 S.Ct. 1116, 86 L.Ed.

The difference in language can be otherwise accounted for. The original scheme of the House was to give to the Secretary of Labor power to declare what industries "affected" interstate commerce. That was to be a condition upon both the child labor provisions, and wages and hours regulation. It had nothing to do with interstate commerce which was to be regulated anyway, without any action by the Secretary. The House plan was amended, however, changing the definition in §§ 206 and 207 to the phrase, "production of goods for commerce," which the courts were to construe without any aid from the Secretary. Section 212—then § 10—as originally proposed, contained two subdivisions: subdivision (a) being the same as it now is, and subdivision (b) containing the phrase, "engaged in commerce in any industry affecting commerce." That was the form also of §§ 206 and 207 during the period while the Secretary was to declare what industries did "affect commerce." Subdivision (b) was deleted, because, as the Conference Report declared, the power given to the Secretary in section 6 of the House amendment had been taken away in Conference. That was perhaps a good reason for not retaining the phrase, "in any industry affecting commerce"; but it must be admitted that it is not clear why subdivision (a) was not amended to conform to §§ 206 and 207. Nevertheless, that gives us no ground for inferring that subdivision (a) was supposed to be more limited than §§ 206 and 207 in their amended form; verbally, as we have seen, it covers the situation at bar, and the reason given for deleting subdivision (b) suffices to show that Congress had no such purpose as the defendant imputes to it.

The defendant's arguments based upon the well-known canons of statutory interpretations we have not disregarded; but it is not necessary to say more than that, whatever their weight, they do not in our judgment overbear the construction we have adopted.

Judgment affirmed.