LENROOT, Chief of Children's Bureau, United States Department of Labor, v. KEMP et al.

No. 630.

District Court, S. D. Mississippi, Jackson Division.

Jan. 6, 1945.

606

Amzy Steed and Harry Campbell, Jr., both of Birmingham, Ala., for plaintiff.

Henley & Woodliff, of Hazlehurst, Miss., for defendants.

MIZE, District Judge.

This cause having come on for trial on August 22, 1944, and the Court having considered the testimony adduced at the trial and the briefs filed by the parties, hereby makes and enters its findings of fact and conclusions of law, as follows:

Findings of Fact

I. The plaintiff, Katharine F. Lenroot, is the Chief of the Children's Bureau, United States Department of Labor. The defendants, Louis Kemp, Paul Kemp, Ford Pitts, and George Marx, are residents of Hazlehurst, Copiah County, Mississippi, within the jurisdiction of this Court.

II. Defendants, as co-partners, doing business under the name and style of Kemp & Pitts, were engaged during the vegetable packing and shipping seasons of 1941 and 1943, which extended in the case of tomatoes through the month of June, in the operation of a vegetable packing shed in Hazlehurst, Mississippi, handling principally tomatoes and cabbage.

The shed is located on the west side of and adjacent to the tracks of the Illinois Central Railroad, and a spur track of this railroad runs alongside of the shed. Occupied entirely by the defendants during the vegetable packing and shipping season, the shed is a two-story frame structure approximately 150 feet long and 30 feet wide.

III. Most of the vegetables handled by defendants were obtained from farms in the general vicinity of the packing shed. The four defendants together had approximately 62 acres of land devoted to the cultivation of tomatoes, which were later packed in their shed; but the total amount of their own tomatoes packed and shipped by the defendants comprised only about 12,500 lugs, which constituted only about 12% of the approximately 150 carloads of tomatoes shipped during each of the 1941 and 1943 seasons, a carload containing approximately 675 lugs of tomatoes, weighing 30 lbs. each. The tomatoes drawn from defendants' farms were commingled with those obtained from other sources upon their delivery to defendants' establishment.

In addition, approximately 15% of the tomatoes shipped by the defendants were graded, sorted and packed by farmers prior to sale and delivery to the defendants for shipment. These tomatoes, too, were commingled by defendants with tomatoes pro-

cured from other sources and, notwithstanding the fact that the grading and packing operations had been performed by the farmers, defendants' employees performed certain operations on such tomatoes after their receipt in the packing shed, such as labeling the lugs, loading the lugs in the freight cars and "stripping" the lugs in the freight cars.

The remaining amount of tomatoes shipped by the defendants, 73% of the total pack, consisted of tomatoes which were obtained from farms other than their own and which were sorted, graded, prepared and packed in their establishment.

IV. Briefly, after the tomatoes are unloaded at the shed, employees of the defendants handle them according to the following operations:

As the tomatoes are brought to the shed, they are unloaded from the farmers' containers called "field carriers" and placed on the floor of the shed. Defendants' employees then place the tomatoes in large bins about 8 feet long, 4 feet wide and 2 feet deep. Other employees then take the tomatoes by hand and place them on a moving conveyor which is mechanically propelled and which both carries the tomatoes and revolves them. As they pass along and revolve in this conveyor, each of four or five employees inspects them for bruises, cuts, disfigurations, wormholes, blisters or other imperfections or defects. The employees remove by hand and discard the tomatoes which are defective.

The tomatoes which are found to be sound and whole are then carried by the conveyor into what is known as a "Tri-Pak" grading machine which is operated by an electric motor. This machine dumps them first into a washing bin where they are washed by a fine spray of water. The machine carries them next into a waxing bin where they are covered with a thin coat of wax designed to serve as a preservative. The tomatoes are then carried by the machine over a conveyor belt perforated with holes which correspond with the three standard grades, commonly known, sold and purchased as "small", "small to medium", and "medium". The "small" size tomatoes fall through the belt on to a conveyor belt which carries them to and dumps them into large bins. The "small to medium" size tomatoes fall through the belt on a different conveyor belt which carries them to and dumps them into other large bins; and the "medium" size tomatoes fall through the belt on to a different conveyor belt which carries them to and dumps them into other large bins. Each of these operations is performed on the first floor of the establishment. The wooden crates or lugs, the containers in which the tomatoes are packed, are constructed on the second floor of the shed. The defendants purchase shooks of wooden materials for the sides, bottoms and tops of the containers and "unitized" wooden pieces for the ends of the containers which are in uniform and specified sizes and ready to be assembled. The material is assembled into finished boxes by nailing ends, sides, bottoms and tops together by hand. Special forms are used in this work to facilitate the assembling operations and to standardize the size of the boxes.

Employees, commonly called "labelers" or "slop boys", then paste labels on the crates bearing one of the defendants' brand names. This operation of pasting on the labels is usually performed on the second floor of the shed, but sometimes is performed after the lugs have been placed in the freight cars. As the crates are completed they are stacked on the second floor. When the tomatoes are ready to be packed into them, an employee, commonly called a "chute boy", drops them down a chute to the ground floor. They pass from this chute onto a shelf in front of employees known as "packers".

The packers stand in front of the bins, in each of which a uniform grade of tomatoes, graded according to size, either "small", "small to medium" or "medium", has already been assembled. As they pack the tomatoes, the packers also grade them according to quality into three standard grades, commonly known, sold and purchased as "U.S. 1", "U.S. 2" and "Commercial". A packer thus receives a crate from the shelf in front of him, takes the tomatoes by hand from the bins (selecting only tomatoes of the same grade, graded according to quality, until the particular crate is filled), wraps them individually into specially cut papers and packs them into standard 30-lb. lugs. The lugs of tomatoes are then placed on a gravity conveyor on which they move to the east side of the shed. There, employees called "set-off boys" carry them to other employees who nail on the lids by hand. The lugs of packed tomatoes are then placed on an-

other gravity conveyor on which they move directly from the shed into the freight cars assigned to the defendants and located on the spur track adjacent to the shed. At the height of the season, as many as five freight cars are in the process of being loaded at the same time. In the freight cars, the lugs of packed tomatoes are taken from the conveyor by hand and loaded properly· for shipment. Then employees commonly called "strippers" secure them in place by long wooden strips called "car strips" to prevent the movement and damage of the lugs in ·transit.

When defendants' customers order, they order a given number of lugs of tomatoes of a particular specified grade of quality and size. The defendants sell their tomatoes under the brand names of "Kemp's Pride" and "Red Feather". The label bearing the brand name of "Kemp's Pride" is pasted on every lug of U.S. 1 tomatoes and the label bearing the brand name "Red Feather" is pasted on every lug of U.S. 2 tomatoes.

V. Defendants employed approximately 100 employees during the peak of the 1941 and 1943 seasons in all occupations in and about the packing shed.

The employees who performed the duties described above in paragraph IV hereof, both with respect to the tomatoes and to the assembly of boxes, were not normally employed by defendants on their respective farms.

VI. In October, 1940, a representative of the Children's Bureau visited the defendants' establishment and explained to the defendant Louis Kemp the provisions and requirements of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., concerning the employment of child labor.

VII. In June, 1941, in the midst of the 1941 tomato packing season, an inspection of defendants' operations was made by a representative of the Children's Bureau, which disclosed the employment of two children under 14 years of age. Another child, 14 years of age, was found working after 7 p.m. The plaintiff's representative informed the defendants Louis Kemp and Ford Pitts, both orally and in writing, that such employment constituted violation of the child labor provisions of the Fair Labor Standards Act and, again, explained the requirements of the Act pertaining to child labor. In December, 1941, plaintiff requested defendants to assure her in a letter that child labor violations would not occur again in the future. This and subsequent requests were ignored until March, 1942, when defendants did finally provide a letter stating that they would comply with the child labor provisions in the future.

VIII. Nonetheless, when defendants' operations were inspected again in June, 1943, in the midst of the 1943 tomato packing season, 8 children under the age of 14 years were found employed. Further, four children between 14 and 16 years of age were engaged in assembling tomato crates or lugs, and two other children, between 14 and 16 years of age, were working in the loft of the shed where such crates or lugs were being assembled.

IX. Practically all of the tomatoes packed in the years 1941 and 1943 were shipped from the packing shed to points without the State of Mississippi, such interstate shipments being virtually of daily occurrence; and the employees discussed in Paragraphs VII and VIII, above, were employed in and about defendants' establishment within 30 days prior to the removal of such goods therefrom.

X. The defendant did not, nor did their foremen, request any of the children involved in this litigation to produce written proof of age either prior to or during their respective employments, and the defendants had not tried to obtain and did not have on file unexpired age certificates issued pursuant to the regulations of the Children's Bureau purporting to show the correct ages of any of these children.

XI. The defendant Louis Kemp, the only one of the defendants to take the stand, testified, and the Court finds, that he intends to comply with the child labor provisions of the Act in the future. Ordinarily, the violations in this case have been such as would require the issuance of an injunction. However, the Court, having seen the defendant Louis Kemp on the stand and knowing the general standing of all of the defendants and their reputations as substantial and law-abiding citizens, does not believe that the issuance of an injunction is necessary in this case to prevent further violations of the Act.

## Conclusions of Law

I. The court has jurisdiction over the parties and of the subject matter involved herein under Section 17 of the Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat. 1060, U.S.C.A.,

Title 29, Sec. 201 et seq., hereinafter referred to as the Act.

■ II. The handling, sorting, grading, preparing, packing and shipping of tomatoes, described hereinabove in finding of fact No. IV, constitutes the production of goods under Section 3(j) of the Act, and defendants' packing shed is, therefore, a "producing" establishment within the intendment of Section 12(a) of the Act. Lenroot v. Western Union Telegraph Co., 2 Cir., 1944, 141 F.2d 400, certiorari granted, 322 U.S. 719, 64 S.Ct. 1057; Bracey v. Luray, 4 Cir., 1943, 138 F.2d 8; Fleming v. Kenton Looseleaf Tobacco Warehouse Co., D.C., E.D.Ky., 41 F.Supp. 255; Slover v. Wathen, 4 Cir., 1944, 140 F.2d 250; Walling v. McCracken County Peach Growers Ass'n, D.C., W.D.Ky., 1943, 50 F.Supp. 900; Walling v. Rockton & Rion Railway Co., D.C., W.D.S.C., 1944, 54 F. Supp. 342; Phillips v. Star Overall Dry Cleaning Co., D.C., S.D.N.Y., 1944, 55 F. Supp. 238.

III. The assembling of tomato crates or lugs, discussed hereinabove in finding of fact No. IV, constitutes the production of goods, within the contemplation of Section 3(j) of the Act, and defendants' establishment is, accordingly, a "producing" establishment under Section 12(a) of the Act.

■ IV. The children involved in this litigation are not employees "employed in agriculture" within the provisions of Sections 13(c) and 3(f) of the Act for the reason that the sorting, grading, preparing, packing and shipping of tomatoes by defendants are not practices performed as an ·incident to or in conjunction with defendants' own farming operations but are activities· performed by defendants separate and apart as an independent commercial enterprise on tomatoes grown on other farms as well as defendants' own. Bowie v. Gonzalez, C.C.A. 1, 1941, 117 F.2d 11; Calaf v. Gonzalez, 1 Cir., 1942, 127 F.2d 934; Walling v. McCracken County Peach Growers Ass'n, D.C.W.D.Ky., 1943, 50 F.Supp. 900; Redlands Foothill Groves v. Jacobs, S.D.Cal., 1940, 30 F.Supp. 995; Jordan v. Stark Bros. Nursery & Orchard Co., D. C.W.D.Ark., 1942, 45 F.Supp. 769; Walling v. Peacock Corporation, E.D.Wis., 1943, 58 F.Supp. 880; Walling v. Lincoln Looseleaf Warehouse Co., E. D. Tenn. 1942, 59 F.Supp. 601; Byus v. Traders Compress Co., W.D.Okla., 1942, 59 F.Supp. 18.

■ The assembling of tomato packing crates or lugs from box shook or unitized materials constitutes manufacturing and processing occupations within the meaning of Section 3(l) of the Act and Child Labor Regulation No. 3, as amended. Hartranft v. Weigmann, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012; American Fruit Growers v. Brogdex Co., 283 U.S. 1, 51 S. Ct. 328, 75 L.Ed. 801; Tidewater Oil Co. v. United States, 171 U.S. 210, 18 S.Ct. 837, 43 L.Ed. 139; Cochrane v. Deener, 94 U. S. 780, 24 L.Ed. 139; Walling v. Armbruster, D.C.W.D.Ark., 1943, 51 F.Supp. 166.

■ VI. The employment of children under 14 years of age in defendants' packing shed during each of the 1941 and 1943 seasons constituted oppressive child labor within the meaning of Section 3(l) of the Act.

VII. During the 1941 tomato packing and shipping season, the employment of children, between 14 and 16 years of age, in defendants' packing shed beyond 7 p. m., constituted oppressive child labor within the meaning of section 3(l) of the Act and Child Labor Regulations No. 3, as amended.

VIII. During the 1943 tomato packing and shipping season, the employment of children between 14 and 16 years of age in the assembling of tomato crates or lugs, or in work rooms or work places where such assembling operations were being carried on, constituted oppressive child labor within the meaning ,of Section 3(l) of the Act and Child Labor Regulation No. 3, as amended.

■ IX. During each of the 1941 and 1943 tomato packing and shipping seasons, the defendants violated Section 15(a) (4) of the Act by shipping in interstate commerce goods produced in their establishment in or about which oppressive child labor was employed within 30 days prior to the removal of such goods therefrom.

■ X. For the reasons stated in finding of fact No. XI, it is not necessary that an injunction enjoining and restraining defendants from violating the provisions of Section 15(a) (4) of the Act should issue.

XI. The court concludes that the defendants should be taxed with the costs of the action.